IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *EX REL*.  :
LOTHAR E.S. BUDIKE, SR.              :
                                     :          CIVIL ACTION
            v.                       :
                                     :          NO. 07-4147
PECO ENERGY, ET AL.                  :

**SURRICK, J.**                                      **SEPTEMBER  13  , 2012**

<u>**MEMORANDUM**</u>

Presently before the Court are Defendants PECO Energy Company, Philadelphia

Regional Port Authority and General Dynamics American Overseas Marine's Motions To

Dismiss the Amended Complaint.  (ECF Nos. 43-45.)   For the following reasons, the Motions

will be granted in part and denied in part.

**I.      JURISDICTION**

We have subject matter jurisdiction over the alleged violations of the False Claims Act

("FCA," or the "Act") in the instant action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §

1331.[1]  We also have supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. §

---

[1] The FCA prohibits a person from making false or fraudulent claims for payment to the
United States and making statements material to false or fraudulent claims. 31 U.S.C. § 3729(a).
Violators of the FCA are liable to the United States for a civil penalty of not less than $5,000 and
not more than $10,000, in addition to treble damages.  *Id.*  The Act is enforced in two principal
ways.  First, the Attorney General may, after a diligent investigation of a violation of Section
3729, bring a civil action against that person. 31 U.S.C. § 3730(a).  Second, a private person
may bring a *qui tam* action in the Government's name for such violation.  31 U.S.C. § 3730(b).
In such a case, the *qui tam* relator must provide the United States with notice of the action, and
the Government is entitled to intervene in the lawsuit.  *Id.*  The relator receives up to thirty
percent of the proceeds of the action, as well as attorneys' fees and costs. 31 U.S.C. § 3730(d).
*See generally Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545
U.S. 409, 411 (2005); *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765,
769-72 (2000).

1367. *United States ex rel. Wilkins v. United Health Grp.*, 659 F.3d 295, 302 (3d Cir. 2011).

## II.    BACKGROUND

### A.    Background Facts[2]

#### 1.    *PRPA Provides Electric Power To LMSR Naval Vessels*

On January 29, 2003, the Philadelphia Regional Port Authority ("PRPA") and the United

States entered into a contract, No. "N00033-03-C-5310."  (Am. Compl. ¶ 14, ECF No. 18.)[3]

Pursuant to this contract, PRPA agreed to provide electric power to two Large, Medium-Speed,

Roll-On/Roll-Off ("LMSR") Naval Vessels ("Vessels") at the Tioga Marine Terminal

("Terminal"), located in Philadelphia, Pennsylvania.  (Am. Compl. ¶¶ 14-15.)  The United States

---

In addition, an individual against whom an employer retaliated for assisting with an FCA investigation or proceeding may bring a private cause of action.  31 U.S.C. § 3730(h).  Under Section 3730(h), the individual may seek remedies, including reinstatement, two times the amount of backpay in addition to interest on the backpay, special damages, litigation costs and attorneys' fees.  *Id.*; *see generally Graham Cnty.*, 545 U.S. at 412.

[2] Generally, on a motion to dismiss, the district court may consider only the facts alleged in the complaint and its attachments.  *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).  In addition, the court may take into consideration "matters of public record" and "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *Fed. Elec. Comm'n v. Arlen Specter '96*, 150 F. Supp. 2d 797, 803 n.5 (E.D. Pa. 2001) (noting that court may consider "court files, records and letters of official actions or decisions of government agencies and administrative bodies when considering a Rule 12(b)(6) motion") (internal quotation marks and citation omitted).

Pursuant to Federal Rule of Civil Procedure 12(b)(6), all factual allegations are viewed in the light most favorable to the nonmoving party.  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("When assessing whether the complaint satisfies [the 12(b)(6)] standard, courts must treat a complaint's allegations as true.").

[3] PRPA is an independent agency located in Philadelphia, Pennsylvania.  Its mission is to enhance "water-borne trade and commerce."  (Am. Compl. ¶ 11.)

agreed to procure electric power from PRPA, which agreed to subcontract electric services "at the most competitive rates obtainable." (*Id.* at ¶ 18.) The competitive rates were to be supported by documentation. (*Id.* at ¶ 20.) The electric power consumed on the Vessels was to be measured on the local utility's meter. (*Id.* at ¶ 16.)

On April 25, 2003, PRPA began ordering electric power from PECO Energy Company ("PECO"). (*Id.* at ¶¶ 16-17, 21.)[4] On October 17, 2003, the Vessels arrived at the Terminal. Shortly after their arrival, PECO began generating and submitting monthly bills to PRPA. (Am. Compl. ¶ 22.) These bills reflected the demand for, and consumption of, electric power supplied to the Vessels. (*Id.*)

### 2. AVE's Comprehensive Energy Audit on Behalf of PRPA

Relator Lothar E.S. Budike, Sr. is a federally licensed United States Marine Chief Engineer, and President of A-Valey Engineers, Inc. ("AVE"), a multi-disciplinary engineering and consulting firm. (*Id.* at ¶ 8.) AVE has over fifty years of experience in working with naval vessels. (*Id.* at ¶ 54.)

In 2005, PRPA hired AVE to provide on-call engineering services at its facilities. (*Id.* at ¶ 26.) AVE conducted a preliminary investigation. At the conclusion of this investigation, AVE recommended a comprehensive energy audit for PRPA. (*Id.*) After reviewing this recommendation, James T. McDermott Jr., Executive Director of PRPA, and Charles J. Lawrence, Director of Engineering for PRPA, expressed concern that PECO was submitting inflated bills for the electric power that was being supplied to the Vessels. (*Id.* at ¶ 29.) As a

---

[4] PECO is a public utility located in Philadelphia. It provides electric and natural gas to residential, business and institutional consumers in Southeastern Pennsylvania. (Am. Compl. ¶ 10.)

result, PRPA hired AVE to conduct the recommended comprehensive energy audit.  (*Id.*)  After

the initial stages of the comprehensive audit, AVE confirmed to PRPA that its billing concerns

were valid.  (*Id.* at ¶ 30.)

On June 22, 2006, PRPA notified PECO that it had retained AVE to investigate the

electric power charges and authorized PECO to release to AVE all documentation and

information related to the investigation.  (*Id.*)  On August 7, 2006, AVE requested from PECO

copies of certain documents, including contracts and monthly bills to PRPA from January 2003

to July 2006.  (*Id.* at ¶ 31.)  On August 21, 2006, PECO responded that all of the documents that

AVE requested were not available since PECO had moved its office location and, over the course

of the move, some documents had been discarded.  (*Id.* at ¶ 32.)  On September 18, 2006, AVE

again requested the information it deemed necessary to complete its audit.  (*Id.* at ¶ 35.)  AVE

also requested that PECO respond in writing to its request for documents.  (*Id.*)  On October 3,

2006, PECO stated that it did not possess any signed agreement between PECO and PRPA with

respect to the Vessels.  (*Id.* at ¶ 33.)  PECO stated that the first bill that it submitted to PRPA,

which had been paid, set forth the terms of agreement.  (*Id.* at ¶ 34.)  In addition, PECO provided

AVE with "an informal, unexplained, customer totalized report for PECO meter (918MQEC-

45482K) installed at the PRPA's LMSR Naval Vessel(s) location," as well as "non-specific

blank forms and reference documents associated with the typical process required to energize a

commercial customer's facility."  (*Id.* at ¶ 36.)  AVE concluded that it was not going to be

provided with all of the documents requested from PECO.  AVE continued to conduct the audit

using information and documents obtained from PRPA's record retention system.  (*Id.* at ¶ 37.)

This included copies of PECO's monthly bills from September 4, 2003 to April 20, 2007.  (*Id.*)

4

As part of its investigation, AVE installed its own meter and monitoring equipment throughout the Vessels.  (*Id.* at ¶¶ 38-39.)  This enabled AVE to monitor continuously and capture the Vessels' energy consumption from September 29, 2006 to April 30, 2007.  (*Id.* at ¶ 40.)

         3.    *Allegations of PECO's Overcharges and Attempts To Conceal These Overcharges*

Relator alleges that "Defendants engaged in a pattern of deception, and fraudulently account[ed] for electric power supply purportedly used in the performance of a government program and contract that was billed to and paid by the United States" and that they

> fraudulently manipulated and grossly inflated the cost of the monthly utility bills submitted to the United States, by directly inflating the units of kilowatts consumed, installing expensive and unnecessary capacitor bank equipment, charging the United States and Commonwealth of Pennsylvania for unnecessary costs and misrepresenting the level of services provided to the United States.

(*Id.* at ¶ 4.)  Specifically, Relator alleges that PECO's monthly energy bills from September 4, 2003 to April 20, 2007 were "grossly inflated and unrealistic."  (*Id.* at ¶ 44.)

         a)    Allegations of False Actual Load Usage Data

In September 2006, shortly after AVE commenced capturing the Vessels' energy consumption, PECO's electric supply meter shut down and ceased to capture electric load usage data.  (*Id.* at ¶ 41.)  During this shut-down period, PECO submitted estimated load usage and meter data to PRPA for payment.[5]  On March 20, 2007, PECO removed its meter entirely.  (Am. Compl. ¶ 42.)  From March 20, 2007 to April 9, 2007, PECO submitted to PRPA bills stating

---

[5] Relator asserts that the "estimated load usage and metering data to the PRPA for payment" was evidenced by the bills from September 19, 2006 to April 20, 2007.  (Am. Compl. ¶ 42.)

actual load usage data.  The data amounted to 793,715 kWh total.  (*Id.* at ¶ 43.)[6]

        b)      Allegations of PECO's Overcharges

Relator's allegations of PECO's overcharges are as follows:

- On April 25, 2003, six months before the Vessels arrived at the Terminal, PECO prepared a contract for supplying electric power to the Vessels.  Relator asserts that PECO "knowingly and intentionally" prepared this "illusory" document, in which figures were "grossly inflated and unrealistic."  (Am. Compl. ¶ 45.)  PECO agreed to reassess this contract once the Vessels arrived at the Terminal and began consuming electric power.  (*Id.*)  In accordance with this agreement, PECO prepared another electric-power-supply contract once the Vessels arrived at the Terminal.  (*Id.* at ¶ 46.)  Relator alleges that while PECO lowered its electric demand requirements, they were still "grossly inflated, unrealistic and a detriment to the United States."  (*Id.*)  Relator asserts that PECO "knowingly and intentionally continued to grossly overcharge the PRPA, who in-turn continued to grossly overcharge[] the United States" and attempted to conceal their "overbilling practices."  (*Id.*)

- During the periods in which only one Vessel was in port, PRPA submitted to the United States expenditure reports that reflected a dollar amount per kilowatt ("kw") that was lower than what PECO was charging PRPA per kw.  (*Id.* at ¶ 47.)  Specifically, PRPA subtracted kw usage from the bills submitted by PECO to PRPA.  (*Id.* at ¶ 23.)  Relator alleges that these reports were "false" and "knowingly and intentionally" submitted and reflects attempts by PECO and PRPA to conceal PECO's overbilling practices.  (*Id.* at ¶ 47.)  Relator alleges that this is evidenced by the fact that the electric power consumption rates on the expenditure reports that PRPA submitted to the United States did not match the corresponding data on the bills that PECO sent to PRPA.  (*Id.* at ¶ 48.)  PECO charged PRPA over ten cents per kw, whereas the reports that PRPA submitted to the United States reflected a four-cents-per-kw charge.  (*Id.*)  The United States, relying on the reports submitted to it by PRPA, paid the electric power bills for the Vessels in full.  (*Id.* at ¶ 24.)  Relator asserts that from September 29, 2006 to April 30, 2007, the United States was overbilled "in excess of $1.4 million dollars."  (*Id.* at ¶ 25.)

- PECO "knowingly and intentionally overcharged the Commonwealth of Pennsylvania during the period when there were no LMSR Naval Vessel(s) in port."  (*Id.* at ¶ 49.)  To maintain a "threshold payment of $25,000 [] per month," PECO charged the

---

[6] A kWh stands for a kilowatt hour.  It is a unit of energy equivalent to 1,000 watt hours, or 3.6 megajoules.  The kilowatt hour is most commonly known as a billing unit for energy delivered to consumers by electric utilities.  (Am. Compl. n.2.)

Commonwealth "as much as $1.40 per kw." (*Id.*)[7]  The average retail price of electric power for commercial customers between the years 2003 to 2007 was between 8.03 and 9.65 cents per kw.  (Am. Compl. ¶ 49.)  AVE and another engineering company, Avoca Engineers and Architects, LLC, conducted tests and, as a result, collectively determined that it was impossible for the Vessels to have consumed the number of kws stated on the bills.  (*Id.* at ¶ 51.)

·       AVE assessed PECO's power supply substation and power distribution equipment.  (*Id.* at ¶ 53.)  It reviewed the substation design documents and technical requirements.  (*Id.*) AVE concluded that Defendants miscalculated the energy requirements for the Vessels and that the substation design was "oversized and flawed." (*Id.*)  Defendants also installed "unnecessary and expensive capacitor bank equipment." (*Id.* at ¶ 55.) Defendants attempted to justify this installation by explaining that the docked Vessels had a "low power factor." (*Id.*)[8]  Relator asserts that the alleged "low power factor" was impossible since the Vessels were in a docked position and were "practically dormant." (Am. Compl. ¶¶ 55, 57.)  Installing the capacitor bank equipment resulted in an increase in the United States' utility bill by as much as thirty percent, through "ratchet charges." (*Id.* at 55.)[9]  Relator asserts that Defendants "knew or should have known that this unnecessary capacitor equipment would increase the United States['] utility bill up to as much as thirty (30%) percent" and installed this equipment "to further subject the United States to grossly inflated and unrealistic electric utility overcharges." (Am. Compl. ¶¶ 55-56.)  In addition, AVE inspected all input and output characteristics of the main switchgear, power transformers, secondary auxiliary electrical equipment, feeds, cable terminations, tracing cable layouts and raceways.  (*Id.* at ¶ 58.)  AVE identified and reported to PRPA the "improprieties committed by PECO," which included the improperly designed and installed electrical power supply substation and its auxiliary equipment.  (*Id.*)  Over the course of its investigation, AVE repeatedly requested from PECO and PRPA official documents supporting the design, building, construction and inspection of the electric power supply substation.  (*Id.* at ¶ 59.)  AVE never received these documents.  (*Id.*)

_____

[7] It appears that the "Commonwealth of Pennsylvania" refers to PRPA.

[8] Relator defines the "power factor of an AC electric power system" as "the ratio of the real power flowing to the load to the apparent power in the circuit, and is a dimensionless number between 0 and 1 (frequently expressed as a percentage, e.g. 0.5 pf = 50% pf)." (Am. Compl. n.3.)

[9] Relator explains that "ratchet charges," also known as "demand charges," reflect the demand rate used to calculate charges.  Based on a twelve-month billing history, they reflect the highest of the maximum demand during the previous eleven months, the maximum demand during the previous summer months, or 100 percent of the current months' use.  (Am. Compl. n.4.)

• For one of the Vessels, only one of the four amp circuit breakers was energized. (*Id.* at ¶ 61.) With the remaining three circuit breakers tripped, the Vessel functioned normally with less than a 400 amp load. (*Id.*)[10] Relator alleges that Defendants billed the United States "over and above what the vessels could actually consume." (Am. Compl. n.6.)[11]

4.   *AVE Reports the Findings of Its Investigation to Defendants*

AVE discussed with PECO, PRPA, General Dynamics American Overseas Marine ("AMSEA"),[12] the United States and John Duke, the Chief Engineer of one of the Vessels, the irregularities and overcharges it discovered during its investigation. (Am. Compl. ¶¶ 60, 62-63.) At one point in time, PECO agreed to reimburse the United States for its overcharges. (*Id.* at ¶ 67.) At another point in time, AMSEA became active in the investigation and installed its own usage and consumption meters on the Vessels. (*Id.* at ¶ 68.) AMSEA compared its meter readings with AVE's meter readings and concluded that AVE's readings were accurate. (*Id.*) PRPA and AMSEA together concluded that PECO's electric charges were up to forty percent higher than both AMSEA's and AVE's meter readings. (*Id.* at ¶ 69.)

AMSEA subsequently requested that AVE drop its investigation because (i) there was no actual independent data going back several years to corroborate AVE's findings and (ii) the Vessels could, in fact, draw the amount of kws that was being billed by PECO. (*Id.* at ¶ 70.)

---

[10] When a circuit breaker is tripped, it blocks electricity from flowing through the wiring, power outlets, equipment and machinery connected to the breaker. (Am. Compl. ¶ 14 n.5.)

[11] In addition, Relator alleges that the installed circuit breakers "had an inappropriate current rating, which created a dangerous current tripping safety protection problem." (Am. Compl. ¶ 63.) The improperly installed power panels posed safety problems as well. (*See id.* at ¶¶ 64-65.)

[12] AMSEA, located in North Quincy, Massachusetts, "is the ship operating segment of General Dynamics Marine Systems. It operates and manages five Maritime Pre-Positioning Ships and seven LMSR Naval Vessels for the United States." (Am. Compl. ¶ 12.)

8

Relator asserts that AMSEA could have provided the missing independent data that AVE needed to complete its comprehensive audit but that it did not.  (*Id.* at ¶ 73.)

     5.  *Termination of AVE's Services*

PRPA issued a stop-work order, which terminated AVE's investigation.  (*Id.* at ¶ 70.) AVE's contract was terminated.  (*Id.* at ¶ 74.)

  **B.**  **Procedural History**

Relator submitted a complaint to the Attorney General of the United States and the United States Attorney's Office for the Eastern District of Pennsylvania.  (*Id.* at ¶ 75.)  In the complaint, Relator alleged that the "improper billing practices by PECO, PRPA and AMSEA were systemic and widespread in its implementation across the country whenever LMSR Naval Vessel(s) were docked and where they were using shore power electric supply power."  (*Id.*)

On October 3, 2007, Relator filed a *qui tam* complaint, pursuant to the FCA.  (Compl., ECF No. 1.)  Relator alleged that the named defendant in the action, PECO, submitted false and fraudulent claims and cost reports to the United States Navy in order to obtain "hundreds of thousands of dollars in overpayment for electricity and related services."  (*Id.* at ¶ 2.)  Relator asserted three causes of action under the FCA:  (i) presentation of false claims; (ii) making or using false records or statements to cause a false claim to be presented; and (iii) making or using false records or statements to avoid an obligation to refund.  (*Id.* at ¶¶ 14-24.)  Relator requested relief in the form of civil damages, treble damages and attorneys' fees and costs.  (*See* Compl.) The *qui tam* complaint was sealed pursuant to 31 U.S.C. § 3730(b)(2).

On November 1, 2010, the United States notified the Court of its intention to not

intervene in this action.  (ECF No. 14.)[13]  On November 2, 2010, we entered an Order that the *qui tam* complaint be unsealed.  The other contents of the Court's file in this action were to remain under seal.  (Nov. 2 Order, ECF No. 15.)  On November 3, 2010, Relator filed a motion requesting a 180-day extension of the seal on the *qui tam* complaint and related filings, as well as "a corresponding extension of time for Service of the Complaint pursuant to Fed. R. Civ. P. 4(m)."  (Rel.'s Ext'n Mot., ECF No. 16.)  Relator stated that he required "additional time to evaluate the information that was recently provided to us by the United States Attorney Office, to conduct further investigative work, and to go over all the facts and circumstances surrounding this highly sensitive case."  (Rel.'s Ext'n Mem. 1, ECF No. 16.)  Relator further stated that "[t]he events involved in this action occurred in the year 2007 and go back several years respectively. If Plaintiff is not allowed an extension of time in which to serve the defendants, through no fault of his own, portions of his claims against these defendants could be time-barred."  (*Id.* at 2.) This motion was granted on November 17, 2010.  (Nov. 17 Order, ECF No. 17.)  The Order granting this motion stated that "[t]he complaint, docket entries and all filings, including the Relators' Motion, shall REMAIN UNDER SEAL until April 3, 2011 or further Order of this Court" and that "[t]he Relators' period in which to conclude its investigative work and to further advise the Court of its decision to proceed in this civil action shall be EXTENDED to April 3, 2011 or further Order of this Court."  (*Id.* at ¶¶ 2-3.)

On April 8, 2011, Relator filed an Amended Complaint.  (Am. Compl.)  The Amended

---

[13] The United States premised its decision not to intervene on the condition that the "action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting"; and in the event that the action be dismissed or otherwise discontinued, that the Court first solicit the written consent of the United States before ruling or granting approval.  (ECF No. 14.)

Complaint named as additional defendants PRPA and AMSEA and contained additional factual

allegations.  (*Id.*)  The Amended Complaint alleged three Counts:  (i) violation of the FCA

(Count I); (ii) retaliation and discrimination under the FCA (Count II); and (iii) retaliatory

discharge of Relator (Count III).  (*Id.* at ¶¶ 77-86.)  The relief requested was the same as in the

original *qui tam* complaint.  (*Id.* at ¶¶ 1, 81, 83, 86.)  On May 4, 2011, we ordered that the

Amended Complaint be unsealed and be served on Defendants.  (May 4 Order, ECF No. 20.)  On

August 9, 2011, we ordered that all documents filed in this action by Relator be unsealed.  (ECF

No. 29.)  The docket text for all docket entries in this action and all documents filed after the

United States' notice to decline intervention were unsealed on August 22, 2011.  (ECF No. 34.)

On July 25, 2011, the Amended Complaint was served on PECO and PRPA.  On August 1, 2011,

the Amended Complaint was served on AMSEA.  (ECF Nos. 39-41.)

On October 14, 2011, PECO filed a Motion To Dismiss Relator's Amended Complaint.

(PECO Mot., ECF No. 43.)  PECO seeks dismissal of the Amended Complaint on several

grounds:

- Dismissal of Amended Complaint for failure to comply with Court Orders and to timely serve PECO with the Amended Complaint;

- Dismissal of Count I for failure to satisfy the pleading requirements of Federal Rules of Civil Procedure 9(b) and 8(a); and

- Dismissal of Counts II and III for failure to state a claim.

(PECO Br., ECF No. 43.)

On October 14, 2011, PRPA also filed a Motion To Dismiss the Amended Complaint.

(PRPA Mot., ECF No. 44.)  In its Motion, PRPA adopted and incorporated PECO's arguments

with respect to (i) Relator's failure to comply with Court Orders and to timely serve the

11

Amended Complaint, (ii) dismissal of Count I for failure to satisfy the pleading requirements of

the Federal Rules of Civil Procedure, and (iii) dismissal of Counts II and III for failure to state a

claim.  (PRPA Br. 19, 27, 29, ECF No. 44.)  In addition, PRPA asserted additional grounds for

dismissal, including:

- Dismissal of all three Counts on grounds of sovereign immunity;

- Dismissal of Count II as being barred by the statute of limitations; and

- Dismissal of Count II for failing to state a claim under Pennsylvania law.

(PRPA Br.)

On October 28, 2011, AMSEA filed a Motion To Dismiss the Amended Complaint.

(AMSEA Mot., ECF No. 45.)  In addition to incorporating the arguments set forth by PECO and

PRPA in their Motions To Dismiss, AMSEA contends that Relator has failed to state FCA and

related retaliation claims against AMSEA, specifically.  (AMSEA Br., ECF No. 45.)

Relator filed a Response opposing Defendants' Motions on December 28, 2011.  (Rel.'s

Resp., ECF No. 48; Rel.'s Mem., ECF No. 48-2.)  On January 17, 2012, PECO, PRPA and

AMSEA each submitted a Reply.  (PECO Reply, ECF No. 49; PRPA Reply, ECF No. 50;

AMSEA Reply, ECF No. 51.)  On January 25, 2012, Relator filed a Reply to PECO's Reply

memorandum.  (Rel.'s Reply to PECO, ECF No. 52.)  On February 6, 2012, Relator filed a Reply

to PRPA's Reply memorandum (Rel.'s Reply to PRPA, ECF No. 53) and a Reply to AMSEA's

Reply memorandum (Rel.'s Reply to AMSEA, ECF No. 54).

Also on February 6, 2012, the Government filed a Statement of Interest, pursuant to 28

U.S.C. § 517, in response to Defendants' Motions.  (Statement of Interest, ECF No. 55.)  In its

Statement of Interest, the Government seeks to correct the record with respect to its conversation

with Relator's counsel.  (*Id.* at 1.)[14]  The Government also requests that, if the Court should find grounds to dismiss the Amended Complaint, that it do so without addressing PRPA's argument concerning sovereign immunity.  (Statement of Interest 5.)  The Government explains that there has been uncertainty in the law regarding this issue and that any decision by this Court "would undoubtedly have wide-ranging implications for cases far beyond this one . . . ."  (*Id.*)  In addition, the Government requests that if this Court does adjudicate the issue of sovereign immunity, that it "expressly limit its decision to those cases, like this one, where the United States had declined to intervene."  (*Id.*)  If the Court declines this request, the Government requests that it and PRPA be allowed to fully brief the issue.  (*Id.* at 8.)  The Government takes no position with respect to the Motions to Dismiss filed by the other Defendants.   (*Id.* at 2.)

## III.    DISCUSSION

### A.    Defendants' Motion To Dismiss, Pursuant to Rule 12(b)(5), for Insufficient Service of Process

Defendants seek to dismiss the Amended Complaint based on Relator's failure to comply with two Court Orders requiring Relator to serve the unsealed Amended Complaint on Defendants and Relator's failure to timely serve Defendants.  (PECO Br. 10; PRPA Br. 19; PECO Reply 2-6; AMSEA Br. 1 n.1; *see also* May 4 Order ¶ 1.)  Defendants assert that Relator "waited nearly four months after the court-ordered extension had expired, and nearly three

---

[14] The Government seeks to clarify Relator's statement that "[t]he U.S. Attorney's office informed the Relator that if he chose to amend his Complaint that it might permit his case to move forward."  (Rel.'s Mem. 11.)  The Government explains that it "did not attempt to condition the relator's right to proceed upon amendment of the complaint."  (Statement of Interest 2.)  Rather, the Government's counsel "suggested to relator's counsel that since she was not the counsel who had originally filed the action on relator's behalf, she might wish to examine the then-filed complaint and to determine for herself whether it met the standards of particularity in Rule 9(b)."  (*Id.*)

months after this Court's second Order to serve PECO [and the other Defendants] with the Amended Complaint." (PECO Br. 11.) Defendants contend that Relator has not provided any justification for this delay in service, that good cause does not exist to excuse the untimely service and that, on these grounds, the Amended Complaint should be dismissed. (*Id.* at 11, 13.)

Relator argues that the Amended Complaint was timely served. Relator further contends that, in the event that this Court determines that the Amended Complaint was untimely served, good cause exists to excuse such untimely service. (Rel.'s Resp. Br. 12-13.)

Under Federal Rule of Civil Procedure 12(b)(5), a defendant may move to dismiss based on insufficient service of process. Rule 4(m) establishes the requirements with respect to service of process:

> If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m). In an action brought pursuant to the FCA, the 120-day time period for service mandated by Rule 4(m) begins with the unsealing of the complaint. *United States ex rel. Pervez v. Maimonides Med. Ctr.*, No. 06-4989, 2010 WL 890236, at *5 (S.D.N.Y. Mar. 9, 2010); *United States ex rel. Mailly v. Healthsouth Holdings, Inc.*, Nos. 07-2981, 09-483, 2010 WL 149830, at *2 (D.N.J. Jan. 15, 2010); *Sweet v. TMI Mgmt. Sys.*, No. 05-1683, 2006 WL 3675709, at *2 (D.N.J. Dec. 12, 2006).

The original complaint was under seal from the filing date of October 3, 2007 to April 3,

2011.[15]  Rather than serve PECO with the original complaint on or before April 3, 2011, Relator

filed an Amended Complaint on April 8, 2011.  (Am. Compl.)  On May 4, 2011, the Court

ordered that the Amended Complaint be unsealed and that Relator serve the Amended Complaint

on all of the named Defendants.  (May 4 Order ¶ 1.)[16]  Thus, Relator had 120 days from May 4,

2011, or until September 1, 2011, to serve the Amended Complaint on Defendants.[17]  Relator

served the Amended Complaint on the named Defendants on July 25, 2011 and on August 1,

2011—well within the 120-day period.  (ECF Nos. 39-41.)  Accordingly, Relator timely served

---

[15] Although we ordered that the original complaint be unsealed in its November 2, 2011 Order, on November 3, 2011, we granted Relator's motion for extension of seal, which extended the seal until April 3, 2011.  (*See* Compl.; Nov. 2 Order; Rel.'s Ext'n Br. 1, ECF No. 16.)

[16] Since the purpose of Federal Rule of Civil Procedure 15 is to have a case decided on the merits rather than on a technicality and that leave to amend a pleading should be freely granted "when justice so requires," Relator's Amended Complaint was accepted.  *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) (quoting Fed. R. Civ. P. 15(a)); *Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874, 886 (3d Cir. 1992) (same); *United States ex rel. Thomas v. Siemens AG*, No. 09-4414, 2010 WL 1711775, at *2 (E.D. Pa. Apr. 26, 2010) (noting that purpose of Rule 15 "is to have a case decided on the merits rather than on a technicality").  We found no undue delay, bad faith or dilatory motive on the part of Relator, nor was there undue prejudice to Defendants.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

[17] Defendants assert that the Court's November 17, 2010 Order required Relator to serve the original Complaint on or before April 3, 2011.  (PECO Br. 11.)  However, the FCA states that a copy of the complaint "shall not be served on the defendant until the court so orders."  31 U.S.C. § 3730(b)(2).  The language of our November 17 Order states that "[t]he complaint . . . shall REMAIN UNDER SEAL until April 3, 2011 *or further Order of this Court*" and "[t]he Relators' period in which to conclude its investigative work and to further advise the Court of its decision to proceed in this action shall be EXTENDED to April 3, 2011 *or further Order of this Court*."  (Nov. 17 Order ¶¶ 2-3 (emphasis added).)  A further Order was entered on May 4, 2011, in which it was ordered that the Amended Complaint be unsealed and served upon Defendants by Relator.  (May 4 Order ¶ 1.)  No date of service was specified in this Order.  (*See id.*)  Thus, Plaintiff had 120 days from May 4, 2011, or until September 1, 2011, to serve the Amended Complaint on Defendants.  *See United States ex rel. Law v. Spurlock*, 582 F. Supp. 2d 1350, 1356 (N.D. Ala. 2008) ("If this court had not expressly ordered otherwise, Rule 4(m), Fed. R. Civ. P. arguably would give relator 120 days from the removal of the seal within which to serve defendants . . . .").

the Amended Complaint on Defendants, and Defendants' Rule 12(b)(5) Motion to Dismiss for

improper service must be denied.[18]

### B.      Defendants' Motion To Dismiss Count I For Failure To State a Claim

Defendants assert that Relator has failed to allege particularized facts to support a viable

claim that they knowingly and intentionally submitted any false or fraudulent claims in violation

of the FCA.  (PECO Mot. ¶ 5; PECO Br. 2-3, 13-26; PECO Reply 6-8; PRPA Br. 21.)

Defendants assert that Relator is required, and has failed, to identify with particularity at least

one specific claim submitted to the United States by any of the Defendants.  (PECO Br. 16;

AMSEA Br. 1; PRPA Br. 22.)  They state that Relator does not, and cannot, provide the

particular details of a scheme to submit false claims or demonstrate that such claims were

actually submitted.  In other words, Relator omits the "who, what, when where or how" of the

alleged fraud.  (PECO Br. 16 n.3, 19; PRPA Br. 21.)  PECO argues that Relator has failed to

allege that it acted with the requisite scienter—knowingly or fraudulently.  (PECO Br. 24; *see*

*also* AMSEA Br. 2, 9; PRPA Br. 22.)  AMSEA argues that Relator can not allege a FCA claim

against it, since it simply operates certain ships for the United States Navy.  It contends that the

---

[18] In addition, PRPA contends that Relator violated Federal Rule of Civil Procedure 21 "by adding two new defendants to the amended complaint, including the PRPA, without first obtaining leave of court."  (PRPA Br. 19-20.)  PRPA argues that Relator is a "veteran litigant with experienced counsel yet has offered no explanation as to why he waited well over three years to amend his complaint by adding new parties and claims."  (*Id.* at 20.)  PRPA argues that, on these grounds, the Amended Complaint should be dismissed.  (*Id.*)  Misjoinder of parties is not a ground for dismissing an action.  Fed. R. Civ. P. 21; *Washington v. Grace*, 353 F. App'x 678, 680 n.2 (3d Cir. 2009); *Sabolsky v. Budzanoski*, 457 F.2d 1245, 1249 (3d Cir. 1970).  Moreover, while dismissal may be appropriate where the amending party has delayed its actions for a significant time, either out of indifference or for reasons of strategy, *see, e.g.*, *Perry v. Snyder*, 33 F.R.D. 361, 362 (E.D. Pa. 1963), Relator sought additional time to continue his investigation so that he could advise the Court of whether to proceed in this action.  Nothing in the record indicates otherwise.

Amended Complaint alleges, at most, that AMSEA failed to assist Relator's efforts to substantiate and report the alleged fraud.  (AMSEA Br. 2, 5-6, 8, 10.)

Relator argues that a more "generous" or "flexible" Rule 9(b) standard should apply and that scienter may be averred generally.  (Rel.'s Resp. 14.)  He contends that he "clearly identifies that PECO, PRPA and AMSEA made misstatements regarding the amount of kilowatts used by the U.S. Navy.  The Defendants were part of the 'group' who helped compile and/or cover up the overcharges."  (*Id.* at 17.)[19]  Moreover, Relator contends that the factual information regarding the alleged fraud is in Defendants' control.  (Rel.'s Resp. 15-16.)

A complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S. Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Courts need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . ."  *Id.*  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Id.* at 1950.  This "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary elements."  *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).

The Federal Rules of Civil Procedure create a system of pleading whereby the particularity with which a litigant must state his claims varies with the substance of his assertions.  As a general matter, pleadings setting forth one or more claims must contain only "a

---

[19] We note that the Amended Complaint has no allegation of, or Count for, conspiracy.

17

short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ.

P. 8(a). However, when a litigant alleges fraud, he must do so "with particularity." Fed. R. Civ.

P. 9(b). In order to satisfy this exacting standard, the plaintiff must "plead (1) a specific false

representation of material fact; (2) knowledge by the person who made it of its falsity; (3)

ignorance of its falsity by the person to whom it was made; (4) the intention that it should be

acted upon; and (5) that the plaintiff acted upon it to his damage." *Shapiro v. UJB Fin. Corp.*,

964 F.2d 272, 284 (3d Cir. 1992) (citing *Christidis v. First Pa. Mortg. Trust*, 717 F.2d 96, 99 (3d

Cir. 1983)). The stringency of this requirement stems from the goal of the Federal Rules of

> protect[ing] a defending party's reputation from harm, to minimize strike suits, and
> to provide detailed notice of a fraud claim to a defending party. The Rule [9(b)] also
> discourages meritless fraud accusations that can do serious damage to the goodwill
> of a business or a professional person. The requirements of Rule 9(b) effectively
> prevent a claimant from searching for a valid claim after a civil action has been
> commenced.

2 James Wm. Moore et al., *Moore's Federal Practice* § 9.03[1][a] (3d ed. 2002) (citations

omitted).

Rule 9(b) commands that "[i]n alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and

other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Pursuant to

this heightened pleading standard, plaintiffs must "plead with particularity the 'circumstances' of

the alleged fraud in order to place the defendants on notice of the precise misconduct with which

they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent

behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.

1984). This requires a description of the "'who, what, when, where and how' of the events at

18

issue." *In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (internal quotation marks and citation omitted). Rule 9(b) is generally considered satisfied when a defendant has "fair notice" of the charges against it. *United States v. Kensington Hosp.*, 760 F. Supp. 1120, 1126 (E.D. Pa. 1991).

The Third Circuit has recognized, however, that most purveyors of fraud, and especially those who engage in fraudulent activities within the corporate sphere, are consciously and vigilantly engaged in an effort to disguise the nature of their endeavors. *See Craftmatic Secs. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (explicitly noting that "sophisticated defrauders" can be expected to attempt to "conceal the details of their fraud"). In order to account for this reality, Rule 9(b)'s particularity requirement is properly relaxed "when factual information [regarding the defendant's conduct] is peculiarly within the defendant's knowledge or control." *Id.* "Nonetheless, even under a non-restrictive application of the rule, pleaders must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based." *Id.*

FCA claims must be pleaded with particularity under Rule 9(b). *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 n.9 (3d Cir. 2004) (citing *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir. 1998). Relator asserts FCA claims under subsections (a)(1), (a)(2) and (a)(7) of Section 3729. (Am. Compl. ¶ 13.)[20]

> 1. *Relator Has Adequately Alleged Section 3729(a)(1) and 3729(a)(2) Claims*

---

[20] With respect to Count I, the parties do not dispute that the pre-amendment version of Section 3729 applies. (*See* Am. Compl. ¶ 13; PECO Br. 18 n.5; AMSEA Br. 3 n.2.) *See infra*, Part III.C.

To state a claim under Section 3729(a)(1) of the FCA, a plaintiff must plead three elements: "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *Schmidt*, 386 F.3d at 242 (quoting *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 182 (3d Cir. 2001)).[21] "In order to prove a claim under § 3729(a)(2), a plaintiff must also show that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved." *Schmidt*, 386 F.3d at 242.[22]

> a)      Section 3729(a)(1) Claim Against PECO

Relator has adequately pleaded a claim against PECO under Section 3729(a)(1). Pursuant to the January 29, 2003 contract between PRPA and the United States, "PRPA [was] to provide auxiliary support services to the LMSR Naval Vessel(s) while they were in port" and "the United States [was to] order reimbursable electric power service from the PRPA." (Am. Compl ¶¶ 14-16.) Pursuant to the contract, PRPA would subcontract electric services from another entity—in

_____

[21] A "claim" is defined as "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).

The terms "knowing" and "knowingly" mean that a person, with respect to information, "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* at § 3729(b). "[N]o proof of specific intent to defraud is required." *Id.*

[22] The Supreme Court has clarified that while a subsection (a)(2) violation does not require subsection (a)(1)'s presentation requirement, an (a)(2) violation requires a showing "that the defendant made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'" *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671 (2008).

this case, PECO.  (*Id.* at ¶¶ 16, 18-20.)  Relator alleges that PECO submitted electric power bills

to PRPA.  These bills were to be reimbursed, and ultimately paid, by the United States.[23]  When

we view these allegations in favor of Relator, PECO caused to be presented to an agent of the

United States a claim for payment.

Relator adequately alleges the "who, what, when, where, and how" of a Section

3729(a)(1) claim.  *In re Rockefeller Cntr.*, 311 F.3d at 217.  He establishes the "what" and "how"

elements of fraud by alleging that PECO "fraudulently account[ed] for electric power supply

purportedly used in the performance of a government program and contract" that was billed to,

and paid for by, the United States, and "fraudulently manipulated and grossly inflated the cost of

the monthly utility bills submitted to the United States, by directly inflating the units of kilowatts

consumed, installing expensive and unnecessary capacitor bank equipment, charging the United

States and Commonwealth of Pennsylvania for unnecessary costs and misrepresenting the level

of services provided to the United States."  (Am. Compl. ¶ 4.)  The Amended Complaint

provides specific examples of this conduct.  (*See, e.g.*, *id.* at ¶¶ 30-37, 45-51.)  Although Relator

does not provide many specific dates in the Amended Complaint, he adequately alleges "when"

the FCA violations occurred.  These violations occurred from September 4, 2003 to 2007.  (*Id.* at

¶ 44); *see United States ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.*, 336 F. Supp. 2d

---

[23] Relator alleges that "[d]uring the meter shut down period PECO began submitting estimated load usage and metering data to the PRPA for payment as evidenced in the invoices / bills submitted by PECO to the PRPA between the periods of September 19, 2006 through April 20, 2007."  (Am. Compl. ¶ 42.)  He alleges that "PECO submitted invoices and billing statements for payment to the PRPA with ***actual*** load usage data amounts totaling 793,715 kWh."  (*Id.* at ¶ 43 (original emphasis); *see also id.* at ¶ 4 (alleging "a government program and contract that was billed to the United States and paid by the United States," "monthly utility bills submitted to the United States," and that Defendants "charg[ed] the United States and Commonwealth of Pennsylvania for unnecessary costs").)

430, 437 (E.D. Pa. 2004) (denying motion to dismiss on Rule 9(b) grounds and finding that although "[t]he scope of the complained-of conduct is vast, and occurred over a long period of time," the complaints specified the "general time frame" over which the fraudulent conduct allegedly occurred). Relator alleges the "where" by identifying that the fraud took place on the Vessels at the Terminal. (Am. Compl. ¶ 45.) Relator alleges the "who" of the FCA violation. He alleges that Nancy Vizzard, PECO's employee, acted on behalf of PECO and took specific actions to perpetrate the fraud from around August 21, 2006 to September 18, 2006. Specifically, in response to AVE's requests for documentation, she claimed that the requested documents were not available (*id.* at ¶ 32) and provided AVE with non-responsive documents in an attempt to perpetrate and conceal the fraud (*id.* at ¶ 36). Such allegations are sufficient to withstand a motion to dismiss on grounds of failure to plead with particularity. *See Gibbons v. Kvaerner Phila. Shipyard, Inc.*, No. 05-685, 2006 WL 328362, at *6-7 (E.D. Pa. Feb. 10, 2006) (denying motion to dismiss because plaintiff sufficiently pleaded the "essential factual background" to support her FCA claim); *see also United States v. Torkelsen*, No. 06-5674, 2007 WL 4245736, at *7 (E.D. Pa. Dec. 3, 2007) (denying motion to dismiss because plaintiff alleged complex scheme and when complaint was read in light most favorable to plaintiff, fraud could be reasonably inferred); *United States ex rel. Drescher v. Highmark, Inc.*, 305 F. Supp. 2d 451, 461 (E.D. Pa. 2004) (denying motion to dismiss because of "the potential existence of sets of facts under which [defendant] may, in fact, be liable under the FCA"); *United States ex rel. Givler v. Smith*, 775 F. Supp. 172, 181-82 (E.D. Pa. 1991) (denying motion to dismiss because in the complaint, relator identified the fraudulent acts and the party allegedly defrauded).

The parties dispute whether identification of at least one specific claim is necessary to

survive a motion to dismiss.  Defendants contend that such identification is necessary.  (PECO

Br. 16, 22-24.)  Relator asserts that it is not.  The Third Circuit has not directly addressed how

Rule 9(b) interacts with the elements of claims under Section 3729(a).  *Cf. Wilkins*, 659 F.3d at

308  ("[T]o our knowledge we never have held that a plaintiff must identify a specific claim for

payment at the *pleading stage* of the case to state a claim for relief.") (original emphasis).

However, other courts have.  In granting a motion to dismiss, the Eleventh Circuit, in *United*

*States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002), held that

a plaintiff must plead the existence of at least one specific claim that was submitted to the

government.  The court stated:

> Rule 9(b)'s directive that "the circumstances constituting fraud or mistake shall be
> stated with particularity" does not permit a False Claims Act plaintiff merely to
> describe a private scheme in detail but then to allege simply and without any stated
> reason for his belief that claims requesting illegal payments must have been
> submitted, were likely submitted or should have been submitted to the Government.

*Id.*  Underlying this holding was the court's recognition that, without some allegation of the

presentation of a false claim to the government, even if a defendant's acts are improper, no

damage has been done to the public fisc.  *Id.*  Some Circuits have followed *Clausen* and have

held that the identification in the complaint of a false claim "is the *sine qua non* of a False

Claims Act violation."  *See, e.g.*, *United States ex rel. Sikkenga v. Regence Bluecross Blueshield*

*of Utah*, 472 F.3d 702, 727 (10th Cir. 2006).  Other Circuits have rejected this requirement.  *See,*

*e.g.*, *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009).

Relying on *Clausen*, the Third Circuit held in *United States ex rel. Quinn v. Omnicare*,

382 F.3d 432, 440 (3d Cir. 2004), that an FCA action requires the identification of at least one

specific claim, and that a relator's theory that false claims "must have been" submitted could not

survive summary judgment.  The *Quinn* court stated that an FCA relator must come to court with a "claim in hand."  *Id.*  However, *Quinn* was decided at the summary judgment stage, and district courts in the Third Circuit remain divided as to whether an FCA action requires identification of at least one specific claim on a motion to dismiss.  *See Wilkins*, 659 F.3d at 308 (noting that *Quinn* was decided on a summary judgment motion).  Some courts have dismissed *qui tam* complaints that failed to identify an actual false claim.  *See United States ex rel. Bartlett v. Tyrone Hosp., Inc.*, 234 F.R.D. 113, 121 (W.D. Pa. 2006); *United States ex rel. Schmidt v. Zimmer, Inc.*, No. 00-1044, 2005 WL 1806502, at *3 (E.D. Pa. July 29, 2005) (citing *Quinn* and *Clausen*).  Other courts have distinguished *Quinn*, noting that the decision upheld a grant of summary judgment, as opposed to a motion to dismiss, and included criticisms of *Clausen*.  *See, e.g.*, *United States ex rel. Singh v. Bradford Reg'l Med. Ctr.*, No. 04-186, 2006 WL 2642518, at *7 (W.D. Pa. Sept. 13, 2006); *United States ex rel. Landsberg v. Levinson*, No. 03-1429, 2008 WL 2246308, at *1 (W.D. Pa. May 29, 2008).  For example, in *Singh*, the court held that requiring the pleading of particularized evidence of a false claim contravenes the Third Circuit's "flexible" interpretation of Rule 9(b) and "would effectively negate the Third Circuit's instruction that 'Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'"  2006 WL 2642518, at *7 (citing *Seville*, 742 F.2d at 791).

The Rule 9(b) requirement that a plaintiff plead with particularity serves to place the defendant on notice of the precise misconduct with which it is charged, and "charges of immoral and fraudulent behavior."  *Seville*, 742 F.2d at 791.  In the instant action, we fail to see how requiring Relator to provide a single claim example would put PECO in a better position to

24

answer and defend against Relator's claims.  The fraud of the instant claims does not turn on anything unique to an individual claim or anything that would be revealed from an examination of any claim.  Relator alleges that PECO "fraudulently manipulated and grossly inflated the cost of the monthly utility bills submitted to the United States, by directly inflating the units of kilowatts consumed, installing expensive and unnecessary capacitor bank equipment, charging the United States and Commonwealth of Pennsylvania for unnecessary costs and misrepresenting the level of services provided to the United States."  (Am. Compl. ¶ 4.)  This allegation is a sufficient description of the scheme since the fraudulent conduct at issue does not rely on any specific claim.  *See United States ex rel. Derwood v. Genentech, Inc.*, 720 F. Supp. 2d 671, 680 (E.D. Pa. 2010) (finding allegation of scheme, supported by details, sufficiently informed defendant of the "precise misconduct" charged); *Singh*, 2006 WL 2642518, at *7 (finding that it was unnecessary for relator to provide a single claim example because "[t]he addition of specific identifying information of each claim adds little to complete the description of the scheme since the fraudulent conduct at issue does not rely on any specific claim"); *see also Merck-Medco*, 336 F. Supp. 2d at 439 (noting that plaintiffs could not be expected to allege every single false statement that was created as a result of the alleged scheme and holding that plaintiffs' description of defendant's system of creating false records and statements sufficient).  The Amended Complaint sufficiently alerts PECO of the alleged wrongdoing.  We will not require Relator to provide a single claim example in these circumstances.

Keeping in mind that no proof of specific intent to defraud is required, Relator adequately alleges that PECO "knew the claim was false or fraudulent."  *Wilentz*, 253 F.3d at 182.  Relator asserts that PECO knowingly attempted to conceal its overbilling practices.  (Am. Compl. ¶¶ 45-

46.)  In support of this allegation, Relator states that PECO, through its employee, Vizzard, refused to comply with Relator's request for documents for the investigation of PECO's billing practices.  (*See id.* at ¶¶ 30-37.)  Relator further alleges that PECO "knowingly and intentionally prepared an illusory contractual document purported to establish electric supply power for the LMSR Naval Vessel(s)."  (*Id.* at ¶ 45.)  To conceal the overbilling, PECO subsequently drafted another contract once the Vessels arrived at the Terminal that reduced the electric demand requirements but were still "unrealistic."  (*Id.* at ¶ 46.)  In support of the allegation that PECO had knowledge, Relator alleges that the rates that PECO charged were much higher than the average retail price of electricity for commercial consumers.  (*Id.* at ¶ 49.)  Another engineering company, Avoca Engineers and Architects, LLC, agreed with AVE's opinion that the energy consumption charged by PECO was not "physically or mathematically" possible.  (*Id.* at ¶ 51.)  When the Amended Complaint is read in a light most favorable to Relator, it can reasonably be inferred from these facts that PECO knew of its overbilling practices.  *See Torkelsen*, 2007 WL 4245736, at *7 (drawing reasonable inference of knowledge in light of complex scheme); *see also United States v. Honeywell Int'l Inc.*, 798 F. Supp. 2d 12, 23 (D.D.C. 2011) (finding that allegations that (i) defendant "possessed a wealth of scientific data showing" degredation of product over time and (ii) defendant "discouraged . . . notify[ing] the end users about problems . . . due to a concern with the negative market impact" allowed for a reasonable inference that defendant had actual knowledge of the falsity of its representations); *cf. Born v. Iannaconne*, No. 97-5607, 1999 WL 357373, at *2 (E.D. Pa. June 3, 1999) (holding that whether defendant had knowledge "is an issue of fact that cannot be resolved on a motion to dismiss").  Relator has sufficiently stated a Section 3729(a)(1) claim against PECO.

b)      Section 3729(a)(2) Claim Against PECO

For similar reasons, Relator has adequately alleged that PECO made or used, or caused PRPA to make or use, a false record in order to cause the false claim to be actually paid or approved by the Government.  *Zimmer, Inc.*, 386 F.3d at 242; *see also Allison Engine*, 553 U.S. at 668 (explaining that "a person must have the purpose of getting a false or fraudulent claim 'paid or approved by the Government' in order to be liable under § 3729(a)(2)").  The Amended Complaint does not specifically allege that PECO knew that PRPA was seeking reimbursement from the United States, or that PECO knew that the bills it submitted to PRPA would be the basis for reimbursement by the United States.  Nevertheless, based on the facts alleged, it is reasonable to infer that PECO knew that the bills it submitted to PRPA would ultimately be paid by the Government.  As discussed *supra*, in Part III.B.1.a, Relator has properly alleged PECO's involvement in a scheme to defraud the Government.  It is alleged that PECO knowingly and intentionally submitted fraudulent inflated bills to PRPA, that PRPA concealed PECO's overbilling practices, and that fraudulent bills were submitted to the United States for payment.  Moreover, PECO knew that it was supplying electric power to LMSR Naval Vessels.  Based upon the allegations in the Amended Complaint, it is logical to conclude that PECO knew that the United States was ultimately paying the bills for these Government vessels.  Accordingly, Relator's Section 3729(a)(2) claim against PECO will not be dismissed.

2.      *Relator's Section 3729(a)(1) and (a)(2) Claims Against PRPA*

In the Amended Complaint, Relator alleges that:

> PRPA knowingly and intentionally submitted false expenditure reports to the United States.  The reports decreased the amount and/or cost PECO was billing and charging the PRPA per kilowatt (kw).  This blatant attempt to conceal the cost PECO was

billing and charging the PRPA per kw helped PECO continue to conceal its
overbilling practices.

(Am. Compl. ¶ 47.)  Based on the allegation that PRPA decreased the amount in charges that

PECO was billing to it, it is reasonable to infer that PRPA knew about PECO's overcharges and

attempted to conceal the fraudulent practice from the Government.  The Third Circuit has stated

that "[d]espite Rule 9(b)'s stringent requirements . . . 'courts should be "sensitive" to the fact that

application of the Rule prior to discovery "may permit sophisticated defrauders to successfully

conceal the details of their fraud."'"  *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410,

1418 (3d Cir. 1997) (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir. 1992) (internal

citation omitted)).  We will not dismiss Relator's Section 3729(a)(1) and (a)(2) claims against

PRPA at this juncture.

> 3.    *Relator's Section 3729(a)(1) and (a)(2) Claims Against AMSEA*

There are no allegations in the Amended Complaint showing that AMSEA knowingly

made, or caused to be made, a false claim paid by the United States.  Indeed, the Amended

Complaint states that AMSEA believed that the Vessels could draw the amount of kws that were

being billed by PECO in its invoices to PRPA.  (Am. Compl. ¶ 70.)

Relator states that AVE brought "all the issues outlined in this complaint" to the attention

of AMSEA.  (*Id.* at ¶ 67.)  He further alleges that "AMSEA became active in the investigation

and . . . concluded that AVE electrical readings were accurate and consistent with current

AMSEA readings."  (*Id.* at ¶ 68.)  In addition, he alleges that PRPA and AMSEA together

concluded that PECO's electric charges were up to forty percent higher than both AMSEA's and

AVE's meter readings.  (*Id.* at ¶ 69.)  Subsequently, however, "AMSEA requested that the

investigation be dropped" because it "had no actual independent electrical metered data going back several years to corroborate AVE's findings" and "AMSEA stated that the LMSR Naval Vessel(s) could in fact draw the amount of electric kws that were invoiced/billed by PECO." (*Id.* at ¶ 70.)  As a result, AVE's investigation was "circumvented." (*Id.*)  Relator alleges that "the only independent data missing over the last several years, which AMSEA could have provided to complete this investigation was a copy of the electric bills / payments made to the utility companies that provided electrical service to the LMSR Naval Vessel(s) while they were in AMSEA's control." (*Id.* at ¶ 72.)  At most, these allegations show that AMSEA failed to assist Relator with his investigation of overcharges.  These allegations cannot support a conclusion that AMSEA knowingly prepared fraudulent bills; knowingly overcharged PRPA or the United States; knowingly submitted, or caused to be submitted, false claims to the United States; or knowingly used, or caused to be made or used, a false record in order for a false claim to be paid. *See United States ex rel. Piacentile v. Wolk*, No. 93-5773, 1995 WL 20833, at *4 (E.D. Pa. Jan. 17, 1995) ("Mere inaction is not enough to constitute a violation of the False Claims Act.") Indeed, there is no allegation that AMSEA was even aware of the existence of the contract between PRPA and the United States.[24]  The Section 3729(a)(1) and (a)(2) claims against AMSEA must be dismissed.

---

[24] In his Reply to AMSEA's Reply memorandum, Relator asserts that "AMSEA was under contract with the U.S. Navy to provide operational and technical support" to the Vessels and that AMSEA's 130-page contract with the U.S. Navy required "maintenance of all logs, charts, records and reports." (Rel.'s Reply to AMSEA 2 & Rel.'s Resp. Ex. 5.)  However, none of these assertions are present in the Amended Complaint.  Moreover, Exhibit 5, on its face, shows nothing from which we can draw any reasonable inference that AMSEA played a role in any alleged scheme by Defendants.  Exhibit 5 appears to be a snippet of Contract Number NC00033-04-C-5300.  This Contract Number is not referenced in the Amended Complaint.

4.      *Relator's 3729(a)(7) Claim Against All Defendants*

To show liability under 31 U.S.C. § 3729(a)(7), a plaintiff must demonstrate that a

defendant "knowingly makes, uses or causes to be made or used, a false record or statement to

conceal, avoid, or decrease an obligation to pay or transmit money or property to the

Government." *Merck-Medco*, 336 F. Supp. 2d at 444.  The plaintiff must allege that the

defendant did not pay back to the government money or property that it was obligated to return.

*Quinn*, 382 F.3d at 444; *United States ex rel. Piacentile v. Sanofi Synthelabo, Inc.*, No. 05-2927,

2010 WL 5466043, at *9 (D.N.J. Dec. 30, 2010).  This means that the defendant must have had

an existing legal obligation to give money or property to the government.  *Sanofi-Synthelabo*,

2010 WL 5466043, at *9 (citing *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1048 (10th Cir.

2004)).  Relator has failed to allege such an existing legal obligation.  Accordingly, the Section

3729(a)(7) claim against all Defendants will be dismissed.[25]

_____

[25] In his Response, Relator states for the first time a theory of conspiracy.  There is no
conspiracy claim in the Amended Complaint.  Indeed, the Amended Complaint states
specifically:

> Defendants' false statements and claims primarily encompass two categories of
> fraudulent acts that were reported by Relator . . . . Defendants engaged in a pattern
> of deception, and fraudulently accounting for electric power supply purportedly used
> in the performance of a government program and contract that was billed to the
> United States and paid by the United States.  Secondly, defendants fraudulently
> manipulated and grossly inflated the cost of the monthly utility bills submitted to the
> United States, by directly inflating the units of kilowatts consumed, installing
> expensive and unnecessary capacitor bank equipment, charging the United States and
> Commonwealth of Pennsylvania for unnecessary costs and misrepresenting the level
> of services provided to the United States.

(Am. Compl. ¶ 4; *see also id.* at ¶¶ 77-81 (no allegation of agreement or conspiracy by or among
Defendants).)  Moreover, the Amended Complaint states that the "pertinent part" of the False
Claims Act consists of subsections (1), (2) and (7) of Section 3729(a), as set forth prior to the
2009 amendments to the Act by Congress.  (*See id.* at ¶ 13.)  Noticeably absent is any reference

### C.      Defendants' Motion To Dismiss Count II for Lack of Standing

In the Amended Complaint, Relator alleges that he and AVE were "discharged and discriminated against in the terms and conditions of his employment contract by the PRPA and AMSEA" in violation of 31 U.S.C. § 3730(h) of the FCA.  (Am. Compl. ¶ 83.)[26]

Defendants contend that Count II should be dismissed because Relator cannot show that he is, or ever was, an employee of Defendants and therefore lacks standing to assert this Count.  Defendants argue that at most, Relator can only show that he was an independent contractor.  (PECO Br. 27 n.8; PECO Reply 9; PRPA Br. 27; PRPA Reply 5-6; AMSEA Br. 6, 10-11; AMSEA Reply 4-5.)

Relator argues that he has standing because Section 3730(h) was amended in May 2009 to extend a cause of action for retaliation to contractors, in addition to employees.  (Rel.'s Br. 20.)[27]

_____

to subsection (3), which concerns a conspiracy claim under the Act.

[26] In his Response, Relator asserts that "if PECO and AMSEA did not conspire[] with the PRPA to conceal the overcharges to the U.S. Navy, his termination would not have been forthcoming."  (Rel.'s Resp. 17.)  However, as mentioned *supra*, at note 25, there is no allegation of conspiracy in the Amended Complaint.  (*See* Am. Compl.)

[27] Section 3730(h) was amended by Congress on May 20, 2009.  The pre-amendment version of Section 3730(h) stated:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h) (2000).  The amended version of the Section states:

> Any employee, **contractor, or agent** shall be entitled to all relief necessary to make

Defendants counter that the 2009 amendment does not apply retroactively. They argue that, because Relator's claims accrued before the date of the amendment—when Section 3730(h) provided a cause of action only to employees—Relator lacks standing on his retaliation claims.

We agree with Defendants. In enacting the 2009 amendment, Congress explicitly provided that the amendment "shall take effect on the date of enactment of this Act and shall apply to conduct on or after the date of enactment." Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(f), 123 Stat. 1617, 1625. Where Congress has "expressly provided that the statute in question . . . should not apply retrospectively . . . , then we should follow Congress' express prescription and apply the statute accordingly." *Mathews v. Kidder, Peabody & Co.*, 161 F.3d 156, 160 (3d Cir. 1998).

Because the conduct that Relator challenges occurred before or during 2007, he cannot claim the benefit of the post-amendment version of Section 3730(h). *See Lytle v. Capital Area Intermediate Unit*, 393 F. App'x 955, 958 (3d Cir. 2010) ("Plaintiffs challenge only conduct occurring well before 2009, and we can find no authority that would give them the benefit of the amended version of § 3730(h).").[28] Nothing in the Amended Complaint alleges that Relator was

---

that employee, ***contractor, or agent*** whole, if that employee, ***contractor, or agent*** is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, ***contractor, or agent*** on behalf of the employee, ***contractor, or agent*** or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h) (2011) (emphasis added).

[28] Indeed, in his November 3, 2010 Extension Motion, Relator stated that "[t]he events involved in this action occurred in the year 2007 and go back several years respectively. If Plaintiff is not allowed an extension of time in which to serve the defendants, through no fault of his own, portions of his claims against these defendants could be time-barred." (Rel.'s Ext'n

an employee of Defendant.  At most, he and AVE were hired as independent contractors.

Accordingly, Count II must be dismissed.  *See Lytle*, 393 F. App'x at 958 (affirming grant of

summary judgment on plaintiffs' retaliation claims based on Section 3730(h)); *Malone v. Omaha

Hous. Auth.*, No. 09-3208, 2011 WL 1435257, at *3 (D. Neb. Apr. 14, 2011) (dismissing with

prejudice Section 3730(h) retaliation claim because plaintiff was not an employee and because he

alleged only pre-May 20, 2009 conduct that at most showed that he "'directly manag[es]

residential real estate rental properties' and has engaged in contracts with [defendant]").

In the alternative, Relator argues that his retaliation claims "date back to late 2009, well

after May 20, 2009, the date § 3730(h) was amended."  (Rel.'s Resp. 21.)  In support of this

argument, he alleges additional facts that were not alleged or referred to in the Amended

Complaint.  Relator instead attaches exhibits to his Response.  (*See id.* at 17-18, 20-21.)  Because

these additional allegations do not appear in the Amended Complaint, they cannot be considered

here.  *See In re Burlington Coat Factory*, 114 F.3d at 1426 (stating that courts deciding a Rule

12(b)(6) motion to dismiss are limited to the allegations found in the complaint, exhibits attached

to the complaint and matters of public record); *Pension Benefit Guar. Corp.*, 998 F.2d at 1196

(noting same); *Burgess-Walls v. Brown*, No. 11-275, 2011 WL 3702458, at *9 (E.D. Pa. Aug. 22,

2011) (holding that plaintiff failed to state a plausible claim of retaliation under Title VII because

allegation appearing in her response to defendants' motion to dismiss did not appear in her

complaint).

A court may consider an exhibit to a defendant's motion to dismiss if the plaintiff's

claims are based on that document and if that document is indisputably authentic.  *Pryor v. Nat'l

Mem. 2.)

33

*Coll. Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002); *Pension Benefit Guar. Corp.*, 998 F.2d at

1196.  Here, the exhibits which Relator now seeks to have the Court consider—specifically,

Exhibits 6, 13, 14 and 15—were not "integral to or explicitly relied upon" in the Amended

Complaint.  *In re Burlington Coat Factory*, 114 F.3d at 1426 (internal quotations and citation

omitted).  Furthermore, Relator does not attach an affidavit or declaration to the Response

attesting that the exhibits are authentic.  Accordingly, we must rely solely on the allegations

contained in the Amended Complaint.  *See Diener v. Renfrew Ctrs., Inc.*, No. 11-4404, 2011 WL

4401720, at *6 n.3 (E.D. Pa. Sept. 22, 2011) (refusing to consider exhibit attached to response to

motion to dismiss because the exhibit was both unauthenticated and constituted hearsay offered

for the truth of the matter asserted).  Relator's claims accrued before May 20, 2009, when

Section 3730(h) provided a cause of action only to employees.  Because there is no allegation in

the Amended Complaint that he or AVE was anything other than an independent contractor,

Relator lacks standing to pursue his False Claims Act retaliation claims.[29]  Accordingly, Count II

---

[29] Even if we did consider Exhibits 6, 13, 14 and 15, these Exhibits do not establish that Relator's retaliation claims accrued after May 2009.  Exhibit 6 is part of an October 20, 2008 letter from AVE to PRPA.  In the letter, AVE notes that the Director of Finance of PRPA stated that AVE's contract to perform services had terminated and that this was the first time AVE had heard of the termination.  AVE requested that the Director formalize his statements in writing.  The letter does not indicate that AVE's contract was terminated any time after May 20, 2009.  It is unclear what Exhibit 13, entitled "Capital Improvement Projects and PRPA Bond Issue Debt Service by I," is, and how it relates to the accrual of a retaliation claim.  Exhibit 14 consists of a June 15, 2009 letter from AVE to PRPA in which AVE attached an updated Professional Liability Insurance Policy, dated June 11, 2009, with PRPA being the certificate holder.  Exhibit 15 is a July 14, 2009 letter from AVE to PRPA.  The letter states that "although the bulk of the work to satisfy the contract provisions has already been completed, it is important that we continue to monitor the electric bills until this entire matter is settled."  In the letter, AVE requests PECO bills from September 2008 to June 2009, which AVE alleges will assist it with determining the total overcharges by PECO to the United States and PRPA.  (*See* Rel.'s Resp. Exs. 6, 13, 14, 15.)  These exhibits do not establish accrual of the retaliation claim after May 20, 2009.

will be dismissed for lack of standing.[30]

### D.    Defendants' Motion to Dismiss Count III for Failure To State a Claim

In the Amended Complaint, Relator alleges in Count III that "[b]y harassing and abruptly discharging [Relator], the defendants willfully and in bad faith retaliated against him in violation of the clear public policy mandated by the False Claims Act and state law, causing him in excess of $1,000,000 in damages."  (Am. Compl. ¶ 86.)

Defendants argue that Count III should be dismissed because (i) Relator "fail[s] to identify any specific statute or case that would support his conclusory assertion that Defendants have violated state law in allegedly retaliating against him" (AMSEA Br. 12; AMSEA Reply 5), (ii) Pennsylvania does not provide for a common law cause of action for wrongful discharge (AMSEA Br. 12; *see also* PRPA Br. 29-30; PECO Br. 26-27 & n.8), and (iii) with respect to PECO, Relator fails to allege any employment or contractual relationship between them or that PECO took any adverse employment or any other type of action against him (PECO Mot. ¶ 6; PECO Br. 27; PECO Reply 9; AMSEA Br. 6, 10).

Relator does not address these arguments in his Response.  He instead alleges for the first time a conspiracy by and among Defendants to retaliate against him.  He argues that claims of retaliation need not meet the heightened pleading requirements for substantive claims under the FCA.  (Rel.'s Resp. 18-19.)

Relator alleges that Defendants' conduct is actionable under "state law" and "decisions of the courts of the Commonwealth of Pennsylvania."  (Am. Compl. ¶ 86.)  However, he fails to

---

[30] Because Relator lacks standing to pursue his retaliation claim under the FCA, we need not address PRPA's argument that Count II should be dismissed on statute-of-limitations grounds.  (*See* PRPA Br. 22-27; PRPA Reply 4-5.)

articulate a theory under which he intends to proceed.  A generalized reference to Pennsylvania's

tort law is not sufficient to survive a motion to dismiss.  *See Twombly*, 127 S. Ct. at 1965 n.3

(explaining that Rule 8 still requires a plaintiff to provide "fair notice" of both "the nature of the

claim" and the "grounds" upon which the claim rests); *Goldhaber v. Higgins*, 576 F. Supp. 2d

694, 728 (W.D. Pa. 2007) (dismissing Pennsylvania state law claims because amended complaint

failed to identify a common law tort theory under which plaintiff could proceed in accordance

with Pennsylvania law).

Nevertheless, even if Relator did specifically allege a state law theory, his claim would be

dismissed for failure to state a claim.  We have already determined that Relator is, at most, an

independent contractor, and not an employee of Defendants.  It is unclear whether a wrongful

discharge claim is available to independent contractors, although there is authority indicating that

it is not.  *See Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 111 (3d Cir. 2004) (finding "no

Pennsylvania case [that] addresses whether there are limitations on a company's ability to

terminate an independent contractor (as opposed to an employee)"); *see also Spyridakis v.

Riesling Grp., Inc.*, No. 09-1545, 2009 WL 3209478, at *7 n.8 (E.D. Pa. Oct. 6, 2009)

("Defendant does, however, make a very strong argument that in view of Pennsylvania's

reluctance to allow employees to assert wrongful discharge claims except in the narrowest of

circumstances, there is little reason to extend the tort to apply to independent contractors.").

Moreover, nothing in the Amended Complaint indicates that the contract between AVE and

PRPA was anything other than an at-will contract.  *Cf. Daniel Adams Assocs., Inc. v. Rambach

Pub., Inc.*, 519 A.2d 997, 1003 (Pa. Super. Ct. 1987) (affirming directed verdict favoring

employer on wrongful discharge claim because employee was "an independent contractor whose

contract was terminable at will upon notice").

To the extent that an independent contractor has standing to bring a state wrongful

discharge retaliation claim, such claim is available only if there is no statutory remedy for the

alleged retaliatory discharge.  *See Preobrazhenskaya v. Mercy Hall Infirmary*, 71 F. App'x 936,

941 (3d Cir. 2003) (holding that Pennsylvania law does not recognize a common law cause of

action for violating public policy where there is a statutory remedy); *Wolk v. Saks Fifth Ave., Inc.*,

728 F.2d 221, 223-24 (3d Cir. 1984) ("The availability of a [statutory] remedy precludes [the]

common law remedies even where the statute is not invoked."); *Buffet v. Warner Comm'n, Inc.*,

692 F.2d 910, 919 (3d Cir. 1982) (noting that "the only Pennsylvania cases applying the public

policy exception have done so where no statutory remedies were available").  Relator alleges a

violation of a public policy "favoring truthfulness and accuracy in representations and claims

made by Government contractors to the United States, and encouraging employees of such

contractors to object to and report violations of this policy."  (Am. Compl. ¶ 86.)  The facts

underlying this allegation are the same facts underlying the FCA retaliation claim.  Whether

Relator's FCA claim can succeed is irrelevant.  "It is the existence of the remedy, not the success

of the statutory claim, which determines preemption."  *DeMuro v. Phila. Hous. Auth.*, No. 98-

3137, 1998 WL 962103, at *5 (E.D. Pa. Dec. 22, 1998) (internal quotation marks and citation

omitted).  Accordingly, Count III fails on these grounds as well.

### E.      PRPA's Motion to Dismiss All Counts on Grounds of Sovereign Immunity

PRPA has moved to dismiss on the ground that it is not a "person" under the FCA since it

is an "arm" of the Commonwealth of Pennsylvania, and therefore, is entitled to sovereign

immunity under the Eleventh Amendment.  (PRPA Mem. 6.)[31]  The Eleventh Amendment states,

in relevant part, that the "[j]udicial power of the United States shall not be construed to extend to

any suit in law or equity, commenced or prosecuted against one of the United States by Citizens

of another State."  U.S. Const. amend. XI.  The Eleventh Amendment also bars suits against a

state by its own citizens, *Hans v. Louisiana*, 134 U.S. 1, 17 (1890), and applies to suits against

state agencies in federal court, *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440

U.S. 391, 401 (1979).[32]  The Act that created PRPA ("PRPA Act") states that:

> [i]t is hereby declared to be the intent of the General Assembly that the authority
> created by this act and its members, officers, officials and employees shall enjoy
> sovereign and official immunity, as provided in 1 Pa.C.S. § 2310 (relating to
> sovereign immunity reaffirmed; specific waiver), and shall remain immune from suit
> except as provided by and subject to the provisions of 42 Pa.C.S. § 8501 (relating to
> definitions) through 8528 (relating to limitations on damages).  Notwithstanding the
> provisions of 42 Pa.C.S. § 8525 (relating to legal assistance), the authority, through
> its legal counsel, shall defend actions brought against the authority, or its members,
> officers, officials and employees when acting within the scope of their official duties.

55 Pa. Stat. Ann. § 697.18; *see also Stevens*, 529 U.S. at 787-88 ("We hold that . . . [the] False

Claims Act does not subject a State (or state agency) to liability in such actions.").[33]

_____

[31] While Relator alleges in his Amended Complaint that PRPA "is an independent agency
of the Commonwealth of Pennsylvania" (Am. Compl. ¶ 11), we will independently determine
whether the agency is an "arm" of the Commonwealth.

[32] While a state may consent to being sued in federal court, Pennsylvania has expressly
withheld such consent, except in certain enumerated circumstances.  *See* 42 Pa. Cons. Stat. Ann.
§ 8521(b); 42 Pa. Cons. Stat. Ann. §§ 8522(a)-(b); 1 Pa. Cons. Stat. Ann. § 2310; 55 Pa. Stat.
Ann. §697.18; *see also Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir. 1981) ("Absent a state's
consent, the eleventh amendment bars a civil rights suit in federal court that names the state as a
defendant, even a claim seeking injunctive relief.  By statute Pennsylvania has specifically
withheld consent.") (internal citation omitted).  None of the enumerated circumstances apply
here.  *See* 42 Pa. Cons. Stat. Ann. § 8522(b).

[33] More precisely, the Supreme Court in *Stevens* held that in light of the various features
of the FCA, both as originally enacted and as amended, the term "person" in the statute does not

To determine whether PRPA is a "person" subject to *qui tam* liability under the FCA,[34] we must examine whether the agency is an arm of the Commonwealth of Pennsylvania. The Third Circuit uses a three-part test for this inquiry: (1) whether the money that would pay the judgment would come from the state; (2) the status of the agency under state law; and (3) the degree of autonomy of the agency. *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989). Historically, the Third Circuit has regarded the first factor as the most important consideration. *See id.* ("Although no single . . . factor is dispositive, the most important is whether any judgment would be paid from the state treasury."); *see also Christy v. Pa. Tpk. Comm'n*, 54 F.3d 1140 (3d Cir. 1995) (stating same); *Heppler v. Pa. Liquor Control Bd.*, No. 10-3430, 2011 WL 2881221, at *4 n.2 (E.D. Pa. July 18, 2011) (citing previous standard). However, in 2005, the Third Circuit acknowledged that following the Supreme Court decision in *Regents of the University of California v. Doe*, 519 U.S. 425, 425 (1997), courts "can no longer ascribe primacy to the first factor." *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 239 (3d Cir. 2005). The Third Circuit explained that "the relevant inquiry is not merely a 'formalistic question of ultimate financial liability.'" *Id.* (citing *Doe*). Instead, courts should inquire into "'the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance.'" *Id.* (citing *Doe*); *see*

---

include states, or state agencies, for purposes of *qui tam* liability. *Stevens*, 529 U.S. at 787. The Court did not expressly find that FCA claims against a state agency are barred by the Eleventh Amendment. *See id.* ("We of course express no view on the question whether an action in federal court by a qui tam relator against a State would run afoul of the Eleventh Amendment, but we note that there is 'a serious doubt' on that score.").

[34] We limit our inquiry to the situation at hand, where the Government has declined to intervene in the FCA matter and a relator is litigating the matter in the Government's name.

*also Cooper v. Southeastern Pa. Transp. Auth.*, 548 F.3d 296 (3d Cir. 2008) ("We still consider

all three factors relevant in assessing whether an entity warrants Eleventh Amendment

protection, but none is predominant."); *Bowers v. Nat'l Coll. Athletic Ass'n*, 475 F.3d 524, 546

(3d Cir. 2007) ("Under current precedent, however, we are required to consider each of the

factors equally when determining whether an entity is entitled to Eleventh Amendment

immunity."); *Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 229 (3d Cir. 2006) ("We now accord

equal consideration to all three prongs of the analysis-payment from the state treasury, status

under state law, and autonomy."); *Heppler*, 2011 WL 2881221, at *4 n.2 (noting that after *Benn*,

"the first factor is considered co-equal with the others in the immunity analysis").

Relator asserts that the first of the three factors continues to be the "most important" and

cites two cases, *Bass v. Consol. Rail Corp.*, No. 93-875, 1994 WL 25380 (E.D. Pa. Jan. 31,

1994), and *Holt Cargo Sys., Inc. v. Del. River Port Auth.*, 20 F. Supp. 2d 803 (E.D. Pa. 1998), in

support of his argument that PRPA is not an arm of the Commonwealth of Pennsylvania.  (Rel.'s

Resp. Mem. 22-24; Rel.'s Reply 2.)[35]  While the district court in those two cases held that PRPA

is not a state agency that would be immune from suit under the Eleventh Amendment, those

cases were decided under the pre-*Benn* analysis.  In both cases, the court found that the second

two factors weighed slightly in favor of granting PRPA Eleventh Amendment protection.  *Holt*,

20 F. Supp. 2d at 819-20; *Bass*, 1994 WL 25380, at *2-3.  However, the courts held that the first

factor was the most important one under the pre-*Benn* test, and as a result, determined that PRPA

---

[35] Neither of these cases involves the FCA.  *Bass* entailed a third-party complaint filed
against PRPA stemming from a plaintiff's injuries due to allegedly unsafe working conditions.
*Bass*, 1994 WL 25380, at *1.  *Holt* was an action pursuant to 42 U.S.C. § 1983 involving
allegations of violations of substantive due process and equal protection rights.  *Holt*, 20 F. Supp.
2d at 803.

was not an arm of the state.  *Holt*, 20 F. Supp. 2d at 820; *Bass*, 1994 WL 25380, at *3.  In light of

the heavy emphasis on the first factor over the other two factors, and considering the change in

law in the immunity analysis since *Benn*, those two decisions are not dispositive of the issue

before us.  Nevertheless, both cases are instructive in assessing the three factors with respect to

PRPA.

      *1.*    *The First Factor - Whether the Commonwealth Would Be Liable for Judgment*

In assessing the first factor of the immunity analysis, we examine (1) whether payment

will come from the state's treasury, (2) whether the agency has the money to satisfy the

judgment, and (3) whether the sovereign has immunized itself from responsibility for the

agency's debts.  *Fitchik*, 873 F.2d at 659.  The Third Circuit has stated that "the nature of the

state's obligation to contribute may be more important than the size of the contribution."  *Id.* at

660 (citing *Blake v. Kline*, 612 F.2d 718, 723 (3d Cir. 1979)).  "What is significant is whether the

money that pays the fine will come from the state treasury rather than the agency's funds, or

(alternatively) whether the state must reimburse the agency and thus effectively pay the debt."

*Id.*

In its Motion to Dismiss, PRPA attaches a Declaration of Edward G. Henderson, the

Director of Finance of PRPA, and a chart showing a financial breakdown of all funds received by

PRPA from Fiscal Years 2002 to 2011.  (Henderson Decl. ¶¶ 1, 3 & Ex. B, PRPA Mot. Ex.)

PRPA asserts that in the fiscal year 2012, the Commonwealth provided $2,463,000 in operating

funds and $4,603,850 for bond payments, which the Commonwealth has guaranteed on behalf of

PRPA.  (*Id.* at ¶¶ 4-5.)  Through the Capital Budget Improvement Acts, the Commonwealth of

Pennsylvania provides additional necessary funds to PRPA to improve port facilities.  In fiscal

year 2010-11, the Commonwealth provided to PRPA $23,731,063 in capital funds for the PRPA

projects.  (*Id.* at ¶ 6.)  Over the past ten years, the Commonwealth provided $394,993,575 to

PRPA, whereas PRPA only received $123,229,617 from its revenues or from other incidental

sources.  (*Id.* at ¶ 7.)  On average, the Commonwealth contributed 76.2 percent of PRPA's

funding.  (*Id.* & Henderson Decl. Ex. B.)[36]  Based on this evidence, PRPA claims that its reliance

on Commonwealth funding is "significant" and it "cannot function without Commonwealth

funds."  (PRPA Reply 9.)  In addition, PRPA asserts that the Commonwealth "exercises great

control and interest over all funds provided to the PRPA, whether the funds come from the

Commonwealth or otherwise."  (*Id.* at 10.)  Not only must a comptroller provide oversight of

funds, but the Commonwealth's Attorney General must also approve all contracts for form and

legality.  (*Id.* at 11.)[37]

Although the Third Circuit has previously held that the percentage of funding an agency

receives from the Commonwealth is the "most important factor" in the analysis of the first factor,

*Bolden v. Southeastern Pa. Transp. Auth.*, 953 F.2d 807, 819 (3d Cir. 1991),[38] post-*Doe*, "the key

---

[36] Relator challenges the figures that PRPA submits in its chart.  Relator claims that the
contractors who received the benefits of the projects were paid directly by the Commonwealth's
Department of General Services, and not the PRPA, and that PRPA is attempting to conceal its
true financial status through its figures.  Relator does not attach contradictory evidence.  In any
event, as discussed *infra*, the percentage of funding an agency receives from the Commonwealth
is no longer the most important factor in the analysis.

[37] PRPA also states that effectively, it cannot secure loans without the Commonwealth's
approval.  (PRPA Mem. 10.)

[38] In *Bolden v. Southeastern Pennsylvania Transportation Authority*, the Third Circuit
considered whether the Eleventh Amendment applies to SEPTA, an entity created by the
Commonwealth of Pennsylvania to provide public transportation.  Applying the *Fitchik* factors,

factor in our assessment of the state-treasury prong" is now the potential legal liability of the

Commonwealth for PRPA's debts.  *Cooper*, 548 F.3d at 304 (quoting *Febres*, 445 F.3d at 236).[39]

---

the Court concluded that SEPTA lacked Eleventh Amendment protection.  953 F.2d at 821.  The Court held that the first factor, funding, was the "most important" factor and "provided an extremely strong indication" that SEPTA was not the alter ego of the Commonwealth.  *Id.* at 818 (internal quotation marks omitted).  With "only about 27% of its revenue [coming] from the state government," SEPTA did not derive its funding primarily from the Commonwealth.  *Id.* at 819.  The Court found that the second factor, SEPTA's status under state law, weighed "slightly" in favor of Eleventh Amendment protection.  Even though SEPTA was proclaimed by statute to be "an agency and instrumentality" of the Commonwealth, the same provision described SEPTA as a "separate body corporate and public."  *Id.* at 820 (internal quotation marks omitted).  With respect to the third factor, SEPTA's autonomy, the Court held that SEPTA enjoyed more autonomy than the New Jersey Transit in *Fitchik*, and thus, this factor weighed in favor of immunity only very slightly.  *Id.*  Considering the totality of the three factors, and considering that the first factor was the most important factor, the Court concluded that "[o]n balance, SEPTA's Eleventh Amendment argument is weaker than NJT's."  *Id.* at 821.  "[I]t follows that SEPTA is not protected by the Eleventh Amendment."  *Id.*

[39] In *Cooper v. Southeastern Pennsylvania Transportation Authority*, the Third Circuit again considered whether SEPTA is entitled to Eleventh Amendment immunity in light of Supreme Court jurisprudence since *Bolden* and the Third Circuit case *Benn*.  The Third Circuit noted that "[a]s set forth in [] post-*Bolden* cases, our inquiry into sovereign immunity is not merely 'a formalistic question of ultimate financial liability.'  We recognize and consider the state-treasury factor on the same terms as the other two *Fitchik* factors."  548 F.3d at 302 (internal citation omitted).  The Court examined the *Fitchik* factors, while acknowledging that "[its] method of balancing the factors ha[d] changed."  *Id.*

With respect to the first factor, the Court found that since *Bolden*, the amount of funding SEPTA received from the state had increased.  While noting that the increased proportion of state funding improved SEPTA's argument for immunity, the Court concluded that it "no longer afford[ed] this subfactor the same weight [it] did in *Bolden*."  *Id.* at 304.  The Court also noted that post-*Doe*, "the key factor in our assessment of the state-treasury prong" is the potential legal liability of the Commonwealth for SEPTA's debts."  *Id.*  The Court held that "[w]hile the Commonwealth provides substantial funding, SEPTA also receives a significant amount of its funding from non-state sources of revenue—and whether two-third or one-half of SEPTA's overall budget, it totals in the hundreds of millions."  *Id.* at 306.  SEPTA could satisfy an adverse judgment from the non-state sources.  Accordingly, this factor weighed against a finding of sovereign immunity.  *Id.*

With respect to the second factor, the Court noted that "little has changed with regard to SEPTA's status under state law since *Bolden*."  *Id.* at 306-07.  Thus, this factor weighed slightly in favor of finding sovereign immunity.  With respect to the third factor, the Court observed that SEPTA's autonomy had diminished since *Bolden*.  The Court found that this third factor weighed

43

Moreover, the appropriate question to ask is whether the Commonwealth is "*obligated*" to pay or reimburse the agency for its debts. *Bowers*, 476 F.3d at 547 (original emphasis) (quoting *Edelman v. Jordan*, 415 U.S. 651, 668 (1974)); *Febres*, 445 F.3d at 233 (noting that "the crux of the state-treasury criterion" is whether the state treasury is legally responsible for the payment of a judgment against the board"). By statute, the Commonwealth has expressly disclaimed liability for PRPA's debts:

> The authority shall have no power, at any time or in any manner, to pledge the credit or taxing power of the Commonwealth or any political subdivision . . . No obligations of the authority shall be deemed to be obligations of the Commonwealth or of any of its political subdivisions . . . The Commonwealth or any political subdivision thereof shall not be liable for the payment of principal or interest on obligations of the authority, excluding payments for lease agreements regarding the property of the authority.

55 Pa. Cons. Stat. Ann. §§ 697.6(c)(1), (3), (4). As explained in *Bass*, "[t]his disclaimer is precisely the immunization from liability that the Third Circuit has found dispositive on the issue of funding." *Bass*, 1994 WL 25380, at *2; *see also Holt*, 20 F. Supp. 2d at 819 (stating same). Although the PRPA Act permits the expenditure of public moneys to support the agency, that support is not mandated. 55 Pa. Cons. Stat. Ann. § 697.2(b). This absence of legal liability is "a compelling indicator that the state-treasury criterion . . . weighs against immunity." *Cooper*, 548 F.3d at 304; *see also Bowers*, 475 F.3d at 547-48 (finding that where the code was "not entirely clear" whether the state had an obligation to fund, the first *Fitchik* factor "may tilt the scale against immunity because statutory language does not clearly obligate the State of Iowa to pay the University's debts"). Accordingly, we conclude that this first factor weighs against

---

slightly against a finding of Eleventh Amendment immunity. *Id.* at 311.
> Balancing the three factors, and "giv[ing] equal consideration to all three factors," the Court concluded that SEPTA was not entitled to Eleventh Amendment immunity. *Id.*

immunity.[40]

        *2.      The Second Factor - Status of Agency Under State Law*

With respect to the second factor—PRPA's status under state law—courts look at (1)

how state law treats the agency generally, (2) whether the entity is separately incorporated, (3)

whether the agency can sue or be sued in its own right, and (4) whether it is immune from state

taxation. *Fitchik*, 873 F.2d at 659.

PRPA argues that this second factor weighs "heavily," not "slightly," in favor of granting

immunity to the agency. (PRPA Mem. 15.) In support of this argument, PRPA points to: (1) the

fact that PRPA is characterized as an "instrumentality of the Commonwealth" and "agency of the

Commonwealth" by state statute, *see* 55 Pa. Cons. Stat. Ann. § 697.4; (2) the language of the

PRPA Act, 55 Pa. Cons. Stat. Ann. § 697.18;[41] (3) the language of 55 Pa. Cons. Stat. Ann. §

---

[40] We note, however, that the fact that the Commonwealth contributed 76.2 percent of PRPA's funding, a substantial proportion, mitigates, to a certain extent, the fact that the Commonwealth is not obligated to pay for PRPA's liabilities and debts. *See Cooper*, 548 F.3d at 304 (finding that increased proportion of Commonwealth funding received by SEPTA "improve's SEPTA's argument for immunity").

While Relator challenges the financial breakdown of funds, as presented by PRPA, he makes only unsupported conclusions that PRPA seeks to conceal its true financial status. In any event, the percentage of revenue that PRPA receives from the Commonwealth is not determinative. *See id.* at 303 (stating that whether SEPTA receives thirty-five percent or fifty-two percent of its revenue from the Commonwealth is not determinative because "[a]lthough relevant, the percentage of Commonwealth funding is no longer predominant").

[41] Section 697.18 states:

It is hereby declared to be the intent of the General Assembly that the authority created by this act and its members, officers, officials and employees shall enjoy sovereign and official immunity, as provided in 1 Pa.C.S. § 2310 (relating to sovereign immunity reaffirmed; specific waiver), and shall remain immune from suit except as provided by and subject to the provisions of 42 Pa.C.S. § 8501 (relating to definitions) through 8528 (relating to limitations on damages). Notwithstanding the provisions of 42 Pa.C.S. § 8525 (relating to legal assistance), the authority, through

697.14;[42] (4) the fact that PRPA has authority to determine zoning and to exercise the power of

eminent domain, a power traditionally given to the states, within the port zone pursuant to 55 Pa.

Cons. Stat. Ann. §§ 697.6(18), 697.21; and (5) the fact that, in contrast to SEPTA's enabling act,

the PRPA Act does not describe PRPA as a "separate body," but rather as "[a] body corporate

and politic," *see Bolden*, 953 F.2d at 820; 55 Pa. Cons. Stat. Ann. § 697.4.

In *Cooper*, SEPTA made similar arguments.  SEPTA argued that its enabling statute

characterized the agency as an agency and instrumentality of the Commonwealth, that the

enabling statute stated that the agency "shall continue to enjoy sovereign and official immunity,"

that SEPTA had the power of eminent domain and that SEPTA is not immune to taxation.

*Cooper*, 548 F.3d at 307.  The Court in *Cooper* explained that the enabling legislation granted it

attributes that are characteristic of an arm of the state and attributes that are not.  Noting that

---

its legal counsel, shall defend actions brought against the authority, or its members,
officers, officials and employees when acting within the scope of their official duties.

55 Pa. Cons. Stat. Ann. § 697.18.

[42] Section 697.14 states, in relevant part:

[S]ince the authority will be performing essential government functions in
effectuating such purposes, the authority shall not be required to pay any taxes or
assessments upon any property acquired or used by it for such purposes, or fees,
bridge tolls or other charges imposed or authorized to be imposed by virtue of any
law of the Commonwealth, except vehicle registration fees, liquid fuels taxes, fuel
use taxes, gross receipts taxes imposed as an excise on the use of public highways,
and tolls imposed by the Pennsylvania Turnpike Commission. The authority shall
have the power to make payments in lieu of taxes or special assessments. The bonds
issued by the authority, and their transfer and the income therefrom, including any
profits made on the sale thereof, shall be free from State and local taxation within
this Commonwealth, other than gift, estate, succession or inheritance taxes.

55 Pa. Cons. Stat. Ann. § 697.14.

"SEPTA's status under state law ha[d] not changed markedly since *Bolden*" in that it "retain[ed] the same essential attributes as before," and that the law governing the weighing of these attributes together had not materially changed since *Bolden*, the Court found that the second factor weighed slightly in favor of a finding of sovereign immunity.  *Id.* at 308.  The same is true here.  There are certain attributes of PRPA under state law that weigh against immunity.  For example, PRPA has the power to sue and to be sued.  55 Pa. Cons. Stat. Ann. § 697.6(b)(2).  It has the power to enter into contracts and to make purchases on its own behalf.  *Id.* at § 697.6(b)(7), (8), (12), (16); *see Cooper*, 548 F.3d at 300 (holding that the power to sue and be sued and the power to enter into contracts and make purchases on SEPTA's own behalf were attributes that were not characteristic of an arm of the state).  However, there are other attributes of PRPA that are characteristic of an arm of the state.  For example, the fact that PRPA has authority to determine zoning and to exercise the power of eminent domain, a power traditionally given to the states, is an attribute that is characteristic of an arm of the state.  *See id.* (noting that the fact that SEPTA possessed "certain public powers such as the power of eminent domain" was an attribute that was characteristic of an arm of the state).  In addition, the statute governing PRPA states that with enumerated exceptions, "the authority shall not be required to pay any taxes or assessments upon any property acquired or used by it for such purposes, or fees, bridge tolls or other charges imposed or authorized to be imposed by virtue of any law of the Commonwealth . . . ."  55 Pa. Cons. Stat. Ann. § 697.14.  This, also, is characteristic of an arm of the state.  *See Cooper*, 548 F.3d at 307 (noting that the fact that SEPTA is immune from state

taxation is an attribute that supports immunity).[43]

The factors for determining PRPA's status under state law do not point clearly in one direction.  However, when we consider all of these factors together, it is clear that this second *Fitchek* factor weighs slightly in favor of Eleventh Amendment immunity.  *See Holt*, 20 F. Supp. 2d at 819 (concluding that second *Fitchik* factor weighed slightly in favor of Eleventh Amendment immunity since PRPA's status was similar to that of SEPTA, and since the Court in *Bolden* held that the combination of factors for this second factor weighed slightly in favor of granting Eleventh Amendment protection); *Bass*, 1994 WL 25380, at *2 ("PRPA's status under Pennsylvania law is almost identical to that of SEPTA; both entities have some sovereign-like characteristics and others that are unlike an arm of the Commonwealth.  The Third Circuit has determined that this combination of factors weighs slightly in favor of granting Eleventh Amendment protection.") (internal citations omitted).

3.    *The Third Factor - Degree of PRPA's Autonomy*

Courts in the Eastern District of Pennsylvania have stated that, with respect to this third factor, PRPA is "somewhat more autonomous than New Jersey Transit, [but] it has somewhat less autonomy than SEPTA since PRPA board members are all appointed by elected Commonwealth officials."  The Court in *Holt* found this factor to weigh "slightly in favor" of

---

[43] Moreover, the Pennsylvania statute governing PRPA states that "it is the intent that . . . its members, officers, officials and employees shall enjoy sovereign and official immunity, as provided in 1 Pa.C.S. § 2310 (relating to sovereign immunity reaffirmed; specific waiver), and shall remain immune from suit except as provided in and subject to the provisions of 42 Pa.C.S. § 8501 (relating to definitions) through 8528 (relating to limitations on damages)."  55 Pa. Cons. Stat. Ann. § 697.18.  *See Cooper*, 548 F.3d at 308 (noting that the Commonwealth's designation of SEPTA as an agency covered under the Pennsylvania Sovereign Immunity Act is "significant but not dispositive").

granting Eleventh Amendment protection, while the Court in *Bass* found this factor, "[a]t the

most," to "weigh slightly in favor of Eleventh Amendment protection . . . ."  *Holt*, 20 F. Supp. 2d

at 819-20; *Bass*, 1994 WL 25380, at *3.

PRPA argues that this third factor should weigh "heavily" in favor of a finding of

immunity.  It points to:  (1) the fact that all members of the PRPA governing body are appointed

by state officials, 55 Pa. Cons. Stat. Ann. § 697.5; (2) the fact that the Governor appoints the

agency's comptroller, approves PRPA's budget and approves the taking of any debt assumed by

PRPA; (3) the Commonwealth Procurement Code governing expenditure of all Commonwealth

agency funds; and (4) the Public Official and Employee Ethics Law.  *See generally* 55 Pa. Cons.

Stat. Ann. §§ 697.1, *et seq.*  However, "[g]ubernatorial appointment of board members typically

weighs only 'slightly' in favor of immunity."  *Febres*, 445 F.3d at 231 (citing *Christy*, 54 F.2d at

1149).  Moreover, the fact that the Governor has some control over PRPA's operations does not

mandate a finding that this autonomy factor weigh heavily in favor of immunity.  *See id.* at 232

(noting that other entities have been held not to be arms of state where they have been subject to

state controls); *see also Hess*, 513 U.S. at 47 (finding that Port Authority was not an arm of the

states of New York and New Jersey, even though the "States appoint and can remove the

commissioners, the Governors can veto Port Authority actions, and the States' legislatures can

determine the projects the Port Authority undertakes").  Considering the decisions in *Holt* and

*Bass*, we conclude that this factor weighs slightly in favor of immunity.

While the first factor weighs against a finding that PRPA is an arm of the Commonwealth

of Pennsylvania, factors two and three weigh in favor of such a finding.  Since the three factors

hold equal weight, and since the first factor does not weigh *substantially* against such a finding,

we are compelled to conclude that PRPA is an arm of the Commonwealth and not a "person" for purposes of FCA *qui tam* liability. *See McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 240 (3d Cir. 2010) (affirming district court's conclusion that defendant was an arm of the Territory and not a person for purposes of Section 1983 where the latter two *Fitchik* factors weighed in favor of defendant being an arm of the territory and the first funding factor weighed slightly against that conclusion); *Heppler*, 2011 WL 2881221, at *8 ("Ultimately, the Court concludes that the PLCB is entitled to sovereign immunity under the Eleventh Amendment. The second and third factors, status at state law and autonomy, both weigh in favor of granting immunity, while only the funding factor weighs against granting immunity."). Accordingly, all Counts against PRPA will, therefore, be dismissed.

## V. DISMISSAL OF COUNTS II AND III AGAINST ALL DEFENDANTS, AND OF ALL COUNTS AGAINST PRPA, IS WITH PREJUDICE; DISMISSAL OF COUNT I AGAINST AMSEA, AND PARTIAL DISMISSAL OF COUNT I AGAINST PECO, ARE WITHOUT PREJUDICE

Relator requests that, in the event that "the Court should find fault with the Relator's Complaint on its face," he be granted permission to amend the Amended Complaint to "correct any deficiencies." (Rel.'s Resp. 41.) Defendants request dismissal of all three Counts with prejudice.

The dismissal of Counts II and III against the Defendants will be with prejudice. Any further amendment would be futile, since, as discussed *supra*, Relator was, at most, an independent contractor. *See Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000) (noting that district court has discretion to deny leave to amend if amendment would be futile); *cf. United States ex rel. Schumann v. Astrazeneca PLC*, No. 03-5423, 2010 WL 4025904, at *8 (E.D. Pa.

50

Oct. 13, 2010) (dismissing FCA claim with prejudice where any attempted amendment would be futile).  With respect to the dismissal of all Counts against PRPA on grounds of sovereign immunity, such dismissal will be with prejudice since any amendment would be futile.

Although we have already granted Relator leave to amend the complaint once, the dismissal of Count I against AMSEA, and of the Section 3729(a)(7) claim against all Defendants, will be without prejudice.  Federal Rule of Civil Procedure 15(a)(2) provides that the Court should "freely give leave" to amend the complaint "when justice so requires."  The Third Circuit has held that "if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips*, 515 F.3d at 236 (citations omitted).  The FCA is not intended to necessarily prevent the amendment of a complaint, particularly for the failure to comply with Rule 9(b), but only the amendment of a complaint through the help of discovery.  *See United States ex rel. Barrett v. Columbia/HCA Health Care Corp.*, 251 F. Supp. 2d 28, 36-37 (D.D.C. 2003); *Tyrone Hosp.*, 234 F.R.D. at 133.  Because the current record does not demonstrate that amendment of the Amended Complaint would be inequitable or futile with respect to Count I against AMSEA, or the Section 3729(a)(7) claim against all Defendants, leave to amend will be granted.  *See Foglia v. Renal Ventures Mgmt.*, 830 F. Supp. 2d 8, 23 (3d Cir. 2011) (granting leave to amend because of failure to demonstrate inequitability or futility as to FCA claims).  Relator will be given the opportunity to cure the deficiencies that we have identified in the Amended Complaint and attach a proposed Second Amended Complaint with respect to Count I.

## VI.    CONCLUSION

For these reasons,  Defendants' Motions are granted in part and denied in part.

An appropriate Order follows.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK, J.**
