IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA *EX REL.* :
LOTHAR E.S. BUDIKE, SR. :
: CIVIL ACTION
v. :
: NO. 07-4147
PECO ENERGY, ET AL. :

SURRICK, J.   NOVEMBER _4_, 2013

**MEMORANDUM**

Presently before the Court is Defendant General Dynamics American Overseas Marine's Motion to Dismiss the Second Amended Complaint (ECF No. 65) and Plaintiff's Motion for Leave to Amend the Second Amended Complaint (ECF No. 66). For the following reasons, Plaintiff's Motion will be granted and Defendant's Motion will be dismissed without prejudice.

**I.   RELEVANT PROCEDURAL HISTORY**

Relator, Lothar E.S. Budike, Sr. submitted a complaint to the Attorney General of the United States and the United States Attorney's Office for the Eastern District of Pennsylvania. (Am. Compl. ¶ 75, ECF No. 18.) In the Amended Complaint, Relator alleged systemic and widespread "improper billing practices by PECO Energy Company ("PECO"), the Philadelphia Regional Port Authority ("PRPA"), and General Dynamics American Overseas Marine ("AMSEA") with regard to providing electricity to certain United States naval vessels. (*Id.*)

On October 3, 2007, Relator filed a *qui tam* complaint, pursuant to the Federal Claims Act ("FCA") 31 U.S.C. §§ 3729 et seq.,. (Compl., ECF No. 1.) Relator alleged that the named Defendant in the action, PECO, submitted false and fraudulent claims and cost reports to the United States Navy to obtain "hundreds of thousands of dollars in overpayment for electricity

and related services." (*Id.* at ¶ 2.) On April 8, 2011, Relator filed an Amended Complaint. (Am. Compl.) The Amended Complaint named as additional Defendants PRPA and AMSEA and contained additional factual allegations. (*Id.*) The Amended Complaint alleges three Counts: (i) violation of the FCA (Count I); (ii) retaliation and discrimination under the FCA (Count II); and (iii) retaliatory discharge of Relator (Count III). (*Id.* at ¶¶ 77-86.) Relator requested relief in the form of civil damages, treble damages, and attorneys' fees and costs. (*Id.* at ¶¶ 1, 81, 83, 86.)

In October 2011, PECO, PRPA, and AMSEA each filed a motion to dismiss. (ECF Nos. 43, 44, 45.) On September 13, 2012, Defendants' motions were granted in part and denied in part. (Sept. 2012 Mem. Op., ECF No. 56.) Counts II and III were dismissed in their entirety, with prejudice. (Sept. 2012 Order, ECF No. 57.) Count I, as it related to PRPA, was also dismissed with prejudice. (*Id.*) Count I against AMSEA, however, was dismissed without prejudice, and the Court gave Relator the "opportunity to cure the deficiencies . . . with respect to Count I." (Sept. 2012 Mem. Op. ¶ 51.) On November 20, 2012, Relator filed its Second Amended Complaint. (SAC, ECF No. 60.) On December 18, 2012, AMSEA filed its Motion to Dismiss Relator's Second Amended Complaint, claiming that Relator has failed to state a claim under the FCA against AMSEA. (AMSEA's Mot., ECF No. 65.) In response, on January 7, 2013, Relator filed his Motion for Leave to Amend the Second Amended Complaint, (Relator's Motion, ECF No. 65) as well as a response in opposition to AMSEA's Motion (ECF No. 67). Relator attached a copy of its proposed Third Amended Complaint (TAC) to his Motion. (Relator's Mot. Ex. B.) On January 15, 2013, AMSEA filed an opposition to Relator's Motion (AMSEA's Opp'n, ECF No. 69), and on January 22, 2013, PECO joined AMSEA's Opposition (ECF No. 70).

## II. RELEVANT FACTUAL BACKGROUND[1]

The factual background surrounding this case is fully set forth in our September 2012 Memorandum Opinion. Our discussion here will be limited to those facts that are relevant to the Motions currently before us. (*See* Sept. 2012 Mem. Op. 2-9.)

### A. PRPA Provides Electric Power to LMSR Naval Vessels

On January 29, 2003, PRPA and the United States entered into a contract, No. "N00033-03-C-5310." (SAC ¶ 13; TAC ¶ 14.) Pursuant to this contract, PRPA agreed to provide auxiliary support services, including electrical power, to two Large, Medium-Speed, Roll-On/Roll-Off ("LMSR") Naval Vessels ("Vessels") at the Tioga Marine Terminal ("Terminal"), located in Philadelphia, Pennsylvania. (SAC ¶¶ 13-14; TAC ¶¶ 14-15.) The United States agreed to procure electric power from PRPA, which agreed to subcontract electric services "at the most competitive rates obtainable." (SAC ¶ 15; TAC ¶ 16.) AMSEA, a ship operating segment of General Dynamics Marine Systems, operates and manages seven LMSR Vessels for the United States. (SAC ¶ 11; TAC ¶ 11.)

On April 25, 2003, PRPA entered into a contract with PECO to provide electric power to the LMSR Vessels. (SAC ¶ 20; TAC ¶ 20.) Shortly after October 17, PECO began generating and submitting monthly bills to PRPA that reflected the demand for, and consumption of, electric power supplied to the Vessels. (SAC ¶ 21; TAC ¶ 21.)

---

[1] In considering AMSEA's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), "we accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *DelRio-Mocci v. Connolly Props., Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (quoting *Warren Gen. Hosp. v. Amgen, Inc.*, 643 F.3d 77, 83 (3d Cir. 2011)). We rely on the operative facts as presented in Relator's Second Amended Complaint and proposed Third Amended Complaint.

### B. AVE's Comprehensive Energy Audit on Behalf of PRPA

Relator is a federally licensed United States Marine Chief Engineer, and President of A-Valey Engineers, Inc. ("AVE"), a multi-disciplinary engineering and consulting firm. (SAC ¶ 8; TAC ¶ 8.) In 2005, PRPA hired AVE to provide on-call engineering services at its facilities. (SAC ¶ 24; TAC ¶ 24.) AVE conducted a preliminary investigation. At the conclusion of this investigation, PRPA hired AVE to conduct a comprehensive energy audit because there were concerns that PECO was submitting inflated bills for electric power being supplied to the LMSR Vessels. (SAC ¶ 27; TAC ¶ 27.)

On June 22, 2006, PRPA notified PECO that it had retained AVE to investigate the electric power charges and authorized PECO to release to AVE all documentation and information related to the investigation. (SAC ¶ 28; TAC ¶ 20.) In August and September 2006, AVE requested from PECO copies of certain documents, including contracts and monthly bills to PRPA from January 2003 to July 2006. (SAC ¶ 29; TAC ¶ 29.) When PECO failed to provide AVE with the information that it requested, AVE continued to conduct the audit using information and documents obtained from PRPA's record retention system. (SAC ¶¶ 30-35; TAC ¶¶ 30-35.)

Also as part of its investigation, AVE installed its own meter and monitoring equipment throughout the Vessels. (SAC ¶¶ 36-37; TAC ¶¶ 36-37.) This made it possible for AVE to continuously monitor and capture the Vessels' energy consumption from September 29, 2006 to April 30, 2007. (SAC ¶ 38; TAC ¶ 38.)

### C. Allegations of PECO's Overcharges and Attempts to Conceal These Overcharges

Relator alleges that "Defendants engaged in a pattern of deception, and conspired with each other to fraudulently provide accounting for electric power supply purportedly used in the performance of a government program and contract that was billed to the United States and paid by the United States." (SAC ¶ 4; TAC ¶ 4.)

The fraudulent activities that Relator alleges are as follows:

- PECO submitted bills with false actual load usage data from March 20, 2007 – April 9, 2007. During this time, PECO submitted bills to PRPA stating actual load usage when PECO did not have a working electric supply meter to capture actual electric load usage data from the Vessels. (SAC ¶ 41; TAC ¶ 41.)

- PECO overcharged the United States for electricity supplied to the vessels in various ways. For one, PECO grossly inflated its electric demand requirements. (SAC ¶ 44; TAC ¶ 44.) In addition, PRPA submitted expenditure reports to the United States that reflected a dollar amount per kilowatt ("kw") that was lower than what PECO was charging PRPA per kw. (SAC ¶ 45; TAC ¶ 45.) Specifically, PECO charged PRPA over ten cents per kw, and yet, the reports that PRPA submitted to the United States reflected that PECO was charging PRPA four cents per kw. (SAC ¶ 46; TAC ¶ 46.) PECO also overcharged the United States by requiring it to maintain a threshold payment of $25,000, when there were no LMSR Vessels in port to maintain, which in effect resulted in the United States being charged well above the average retail price for electric power during that time. (SAC ¶ 47; TAC ¶ 47.) Relator further alleges that PECO installed unnecessary expensive equipment that resulted in an increase in

5

the United States' utility bill by up to 30 percent. (SAC ¶¶ 53-54; TAC ¶¶ 53-54.)

Lastly, Relator alleges that PECO billed the United States for more electricity than the Vessels could actually consume. (SAC ¶ 49; TAC ¶ 49.)

In the September 2012 Memorandum Opinion, we determined that Relator's allegations against PECO sufficiently stated a claim under Sections 3927(a)(1) and 3927(a)(2) of the FCA. (Sept. 2012 Mem. Op. 19-27.)

### D. AVE Reports the Findings of Its Investigation to Defendants

AVE discussed with PECO, PRPA, AMSEA, the United States, and John Duke, the Chief Engineer of one of the Vessels, the irregularities and overcharges it had discovered during its investigation. (SAC ¶¶ 58, 60, 65; TAC ¶¶ 58, 60, 65.) At one point, PECO agreed to reimburse the United States for its overcharges. (SAC ¶ 65; TAC ¶ 65.) At another point in time, AMSEA became active in the investigation and installed its own usage and consumption meters on the Vessels. (SAC ¶ 66; TAC ¶ 66.) AMSEA compared its meter readings with AVE's meter readings and concluded that AVE's readings were accurate. (*Id.*) AMSEA concluded that PECO's electric charges were up to 40 percent higher than both AMSEA's and AVE's meter readings. (SAC ¶ 67; TAC ¶ 67.)

AMSEA subsequently asked AVE to drop its investigation. (SAC ¶ 68; TAC ¶ 68.) Relator asserts that AMSEA could have stopped the overbilling practices by PECO by providing AVE with information to complete its investigation. (SAC ¶¶ 69, 72; TAC ¶¶ 69-72.) Specifically, AMSEA withheld critical information, electrical data, and information regarding payments made to the utility companies that provided electrical service to the LMSR Naval Vessels within AMSEA's control. (SAC ¶ 72; TAC ¶ 74.) In addition, when AVE asked AMSEA "Can the LMSR Naval Vessel(s) that were docked at the Tioga Marine Terminal

exceed the usage parameters dictated by (1) each / 400 AMP circuit breaker during a 42 hour cycle/period?" AMSEA did not answer "NO." (SAC ¶ 69; TAC ¶ 69.) The industry standards, as well as the laws of mathematics and physics, supported a "NO" answer. (SAC ¶¶ 69-70; TAC ¶¶ 69-70.) Had AMSEA provided the information AVE requested, AVE's investigation could have been completed and the overbilling practice by PECO stopped. (SAC ¶ 72; TAC ¶ 74.)

### E. Relator Adds Additional Facts in the Proposed Third Amended Complaint

In its proposed Third Amended Complaint, Relator includes additional facts about AMSEA's interaction with PECO and PRPA. In September 2007, PECO requested information about the maximum electrical usage by type of vessel and historical data for LMSRs lay berthed in other U.S. ports. (TAC ¶ 72a & Ex. A.) In December 2007, AVE sent a letter to PRPA with regard to meter readings that PRPA submitted to AVE in November 2007. (TAC Ex. B.) Specifically, AVE wanted to know who compiled the numbers for the meter readings and if PRPA accepted the meter readings as "true and accurate." (*Id*.) In response to AVE's letter, PRPA informed AVE that AMSEA had compiled the numbers, and that the Military Sealift Command had sent the numbers to PRPA. (TAC Ex. C.) PRPA also explained that it had requested the meter readings to gather historical information on the electrical consumption at other ports for Military Sealift Command vessels that were in Philadelphia. (*Id.*) PRPA said that there was "little discrepancy between PECO readings" and the readings by AMSEA for the current set of vessels at the Terminal. However, there was a substantial discrepancy with the previous vessel lay berthed at the Terminal. (*Id.*) PRPA further noted that it was not aware of any certification by AMSEA that the November 2007 readings were accurate. (*Id.*)

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 15(a) provides that the Court should "freely give leave" to amend the complaint "when justice so requires." Fed. R. Civ. P. 15(a). "Grounds that could justify a denial of leave to amend include undue delay, bad faith, dilatory motive, prejudice," and futility. *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 309 (3d Cir. 2003) (citing *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000)). "In the absence of substantial or undue prejudice to the nonmoving party . . . denial instead must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment." *USX Corp. v. Barnhart*, 395 F.3d 161, 166 (3d Cir. 2004) (internal quotation marks omitted). "Futility means that the complaint, as amended, would fail to state a claim upon which relief could be granted" under the Rule 12(b)(6) standard of legal sufficiency. *Shane*, 213 F.3d at 115 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)). "Accordingly, if a claim is vulnerable to dismissal under Rule 12(b)(6), but the plaintiff moves to amend, leave to amend generally must be granted unless the amendment would not cure the deficiency." *Id.*

Under Rule 12(b)(6), failure to state a claim upon which relief can be granted is basis for dismissal of the complaint. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint that merely alleges entitlement to relief, without alleging facts that show entitlement, must be dismissed. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). This "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation

that discovery will reveal evidence of' the necessary elements." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "A complaint may not be dismissed because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *McTernan v. City of York*, 564 F.3d 636, 646 (3d Cir. 2009).

As a general matter, pleadings setting forth one or more claims must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Yet, as discussed in our September 2012 Memorandum Opinion, when a litigant alleges fraud, he faces a heightened pleading standard, under which he must allege fraud "with particularity." Fed. R. Civ. P. 9(b); (Sept. 2012 Mem. Op. 17-19.) This heightened pleading standard does not apply to civil conspiracy claims, even when the action involves a civil conspiracy to defraud, and the underlying elements of fraud are subject to the heightened pleading standard. *Rose v. Bartle*, 871 F.2d 331, 366-67 (3d Cir. 1989). Several courts in this circuit have specifically addressed the pleading standards for conspiracy claims brought under the FCA. *U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.*, No. 94-7316, 2000 WL 1207162, at *10 (E.D. Pa. Aug. 24, 2000) (hereinafter *Atkinson I*); *see United States ex rel. Bartlett v. Tyrone Hosp., Inc.*, 234 F.R.D. 113, 123 (W.D. Pa. 2006); *United States v. Metzinger*, No. 94-7520, 1996 WL 530002, at *3 (E.D. Pa. Sept. 17, 1996); *United States v. Warning*, No. 93-4541, 1994 WL 396432, at *5 (E.D. Pa. July 26, 1994). Those courts required the plaintiff to plead the allegations of the direct violation of the FCA with specificity, in compliance with Rule 9(b), but did not require the same for the allegations concerning the composition and objective of the conspiracy. Instead, the plaintiff's conspiracy allegations needed to comply only with the more relaxed notice pleading requirements of Rule 8(a). We agree with the reasoning of those courts. Therefore, to successfully state a claim under Section 3729(a)(3), Relator must only meet the

9

pleading standards of Rule 8(a) by describing the general composition of the conspiracy, some or all of its broad objectives, and Defendants' general roles in the conspiracy. *See Atkinson I*, at *10.[2]

## IV. DISCUSSION

### A. Relator's Motion for Leave to Amend the Second Amended Complaint

In his Motion, Relator seeks to amend the Second Amended Complaint by filing a Third Amended Complaint that would allegedly cure any deficiencies in its previous pleadings and properly allege a claim that PECO and AMSEA conspired to defraud the United States in violation of 31 U.S.C. § 3729(a)(3).[3] AMSEA argues that Relator should not be permitted to amend the Second Amended Complaint because the proposed amendment was unduly delayed and prejudices AMSEA. AMSEA further claims that Relator's amendment would be futile

---

[2] Other circuits have required that conspiracies to defraud involving fraud be pled with particularity in accord with Rule 9(b). *See generally Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 790 (4th Cir. 1999); *Hayduk v. Lanna*, 775 F.2d 441, 443-44 (1st Cir. 1985); *U.S. ex rel. Long v. SCS Bus. & Technical Inst.*, 999 F. Supp. 78, 89-90 (D.D.C. 1998) (rev'd on other grounds).

We decline to follow these cases. We conclude that a plaintiff bringing a conspiracy claim under the FCA is not required to meet Rule 9(b) standards when pleading the elements of the conspiracy. This conclusion is based on the Third Circuit's statement that allegations of civil conspiracy are not measured under the Rule 9(b) standard, *Rose*, 871 F.2d at 366-67, in conjunction with the notion that general principles of civil conspiracy apply to FCA conspiracy claims, *see generally U.S. ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 546 n.3 (7th Cir. 1999); *United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991); *U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.*, No. 94-7316, 2004 WL 1686958, at *4 (E.D. Pa. July 28, 2004). We see no reason why the pleading standards described by the Third Circuit for a civil conspiracy involving a fraud would differ from that for a conspiracy involving a fraud under the FCA.

[3] In his Motion, Relator clarified that the Second Amended Complaint and proposed Third Amended Complaint do not assert claims against AMSEA under 31 U.S.C. § 3729(a)(1) or 31 U.S.C. § 3729(a)(2). (Relator's Mot. 7.) Also, the parties do not dispute that the pre-2009 version of Section 3729 applies. (*See* Sept. 2012 Mem. Op. 19 n.20; SAC ¶ 12; AMSEA's Opp'n 3 n.3.)

because Relator does not sufficiently allege AMSEA and PECO entered into an agreement to defraud, nor does he allege that any such agreement was for the purpose of defrauding the United States by getting a false or fraudulent claim allowed or paid. We disagree.

A denial of leave to amend can be based on undue delay, prejudice, bad faith, or futility. *General Refractories Co.*, 337 F.3d at 309. Despite AMSEA's contention otherwise, Relator's Motion does not come after undue delay. Rather, Relator's Motion was filed less than one month after AMSEA's Motion was filed. Moreover, AMSEA has not established how it would be prejudiced by allowing Relator to amend the Second Amended Complaint but instead summarily states that it "is prejudiced in its ability to defend the action by delay occasioned by Relator's repeated failed pleadings." (AMSEA's Opp'n. 6.) AMSEA does not specifically show how it will be "deprived of the opportunity to present facts or evidence which it would have offered" had the amendment been filed earlier. *See Roche v. E.F. Hutton & Co., Inc.*, 658 F. Supp. 315, 319 (M.D. Pa. 1986) (quoting *Heyl & Patterson Int'l., Inc., v. F.D. Rich Hous.*, 663 F.2d 419, 426 (3d Cir. 1981) (explaining delay alone without showing of undue prejudice to nonmoving party is inadequate basis for denying party leave to amend pleadings)). In addition, there is nothing to suggest that Relator is seeking amendment in bad faith. Based on these facts, prejudice, bad faith, and undue delay are not proper grounds for denying Relator's Motion. Our analysis, then, must focus on whether Relator's Motion should be denied because amendment would be futile. We must therefore determine if Relator's proposed Third Amended Complaint adequately states a claim.

Section 3729(a)(3) of the FCA imposes liability on an individual who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3)(2008). To successfully state a claim under the FCA for conspiracy, a plaintiff must

show: "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States; and (2) that one or more conspirators performed any act to get a false or fraudulent claim allowed or paid." *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 255 F. Supp. 2d 351, 409 (E.D. Pa. 2002) (hereinafter *Atkinson II*) (citing *United States v. Hill*, 676 F. Supp. 1158, 1173 (N.D. Fla. 1987)); *see Bartlett*, 234 F.R.D. at 123 (citing *Blusal Meats, Inc. v. United States*, 638 F. Supp. 824, 828 (S.D.N.Y 1986). "The essence of a conspiracy under the Act is an agreement between two or more persons to commit fraud." *United States ex rel. Lampkin v. Johnson & Johnson, Inc.*, No. 08-5362, 2013 WL 2404238, at *6 (D.N.J. May 31, 2013); *United States ex rel. Piacentile v. Sanofi Synthelabo, Inc.*, No 05-2927, 2010 WL 5466043, at *24 (D.N.J. Dec. 30, 2010).

"To state a claim under the FCA for conspiracy, a plaintiff must plead that the alleged conspirators agreed to make use of a false record or statement to achieve the end of getting the government to pay a claim." *United States v. Toyobo Co. Ltd.*, 811 F. Supp. 2d 37, 50 (D.D.C. 2011); *see Long*, 999 F. Supp. at 89-90 (finding plaintiff properly pled conspiracy claim under FCA by alleging defendants conspired "to conceal and protect" an FCA fraud when they limited the investigation into the fraud to allow defendants to continue to present false claims to the government). Wholly conclusory allegations of a conspiracy that do not specify the parties involved or the agreement at issue will not survive a motion to dismiss. *Atkinson I*, 2000 WL 1207162, at *12 (dismissing FCA conspiracy claim that was pled in consclusory fashion and did not clearly state what parties were involved in the conspiracy); *Bartlett*, 243 F.R.D. at 123 (dismissing FCA conspiracy claim when plaintiff did not identify alleged conspirators by name nor allege any agreement to submit claims to the government).

In its proposed Third Amended Complaint, Relator claims that AMSEA and PECO conspired to defraud the United States by agreeing that PECO would continue to overcharge the United States for electricity provided to LMSR Vessels. Relator alleges that AMSEA's role in the conspiracy was to limit or stop AVE's investigation so that PECO's overcharging could continue. To support his allegations, Relator states that AMSEA knew PECO was overcharging the United States for electricity and yet refused to cooperate with AVE's investigation. Relator specifically alleges that AVE informed AMSEA of PECO's overcharges to the United States. AMSEA also discovered on its own that PECO's meter readings were high by monitoring the electric usage of the LMSR Vessels and comparing its usage readings to PECO's. Despite knowledge of PECO's overchargings and high usage readings, AMSEA limited AVE's investigation by refusing to provide critical information and eventually requesting that AVE's investigation be stopped. Accepting these allegations as true, Relator has alleged facts that create a plausible inference that AMSEA and PECO agreed that AMSEA would inhibit AVE's investigation so that PECO could continue to present false claims to the United States by overcharging for electricity provided to LMSR Vessels. *See Long*, 999 F. Supp. at 89-90. Further, Relator has sufficiently alleged that AMSEA took an overt act in furtherance of the agreement. AMSEA took an overt act when it refused to cooperate with AVE's investigation, thereby limiting AVE's investigation and allowing PECO's submission of false claims that overcharge the United States for electricity to continue. *See id.* at 90.

Because Relator has "describe[d] the general composition of the conspiracy, its broad objective, and defendants' general roles in the conspiracy[,]" in his proposed Third Amended Complaint, Relator's conspiracy claim satisfies the Rule 8(a) pleading standard and sufficiently

states a claim.[4] *See Atkinson II*, 255 F. Supp. 2d at 409; *see also Metzinger*, 1996 WL 530002, at *3 (finding plaintiff adequately pled conspiracy under the FCA when complaint set forth how defendants ran Medicare false billing program, who participated in the program, and the nature of the fraudulent claims). Accordingly, allowing Relator to amend his complaint would not be futile. Relator's Motion will be granted.

### B. AMSEA's Motion to Dismiss Relator's Second Amended Complaint

AMSEA moves to dismiss Relator's Second Amended Complaint claiming that Relator has failed to state a claim against AMSEA under the FCA. Because we have determined that Relator will be permitted to amend the Second Amended Complaint, AMSEA's Motion will be dismissed without prejudice.

### V. CONCLUSION

For the foregoing reasons, AMSEA's motion will be dismissed, and Relator's Motion will be granted. An appropriate order follows.

BY THE COURT:

_____
**R. BARCLAY SURRICK, J.**

---

[4] We previously determined that the fraud allegations underlying this alleged conspiracy were pled with particularity as required by Rule 9(b). (Sept. 2012 Mem. Op. 19-27.)