IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *EX REL.* | : | |
| LOTHAR E.S. BUDIKE, SR. | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 07-4147 |
| PECO ENERGY, ET AL. | : | |

**MEMORANDUM**

**SURRICK, J.**                                                                              **AUGUST__18__, 2015**

Presently before the Court is PECO Energy Company's Motion for Summary Judgment joined in by Defendant General Dynamics, American Overseas Marine ("AMSEA"). (ECF Nos. 94 and 96.) For the following reasons, the Defendants' Motion will be granted.

## I.      RELEVANT FACTUAL BACKGROUND

### A.      PRPA Contracts with the Navy and with PECO

In January 2003, the Philadelphia Regional Port Authority ("PRPA") and the United States Navy entered into a contract under which PRPA was to provide layberth facilities and services for up to two naval vessels[1] at the Tioga Marine Terminal in Philadelphia, Pennsylvania. (PECO Mot. for Summ. J. Ex. 2, ECF No. 94.) As part of that contract, PRPA was required to provide "metered shore power services" to the Navy ships while they were in port. (*Id.* at PECO_FOIA_001_00000693.[2]) The contract dictated that PRPA would pay for the shore power

_____

[1] These vessels are also known as "LMSR" ships. The "LMSR" stands for Large, Medium-Speed, Roll-On/Roll-Off. (Third Am. Compl. ¶ 11, ECF No. 66.)

[2] We include the Bates stamp number of the document to which we are referring within the exhibit when that is necessary for clarification.

and then invoice the Navy regularly for reimbursement for the power consumed by the vessels.[3]

(PECO Mot. for Summ. J. Ex. 2 at PECO_FOIA_001_00000694-95.)

After it won the contract, the Port Authority hired contractors to construct the layberth. One of those contractors was William D. Brown, an engineer who designed and built the electrical service. (*Id.* Ex. 1 at 286 & Ex. 6.) In February 2003, Brown submitted an "Application for Electric Service & Meter" to PECO, requesting that the company institute a new, 13,200 volt service at the Terminal for the ships as soon as possible. (*Id.* at Ex. 8.) Given Brown's request for high voltage (on the order of 13,200 volts), PECO offered to provide electrical service at the high-tension (HT) rate. (*Id.* at Ex. 9 ¶ 8.)

HT service is akin to the wholesale delivery of electricity. (*Id.*) Under the HT scheme, PECO delivers electricity from its primary supply lines to the customer at high voltages, and the customer is responsible for providing a transformer to bring the voltage down for its particular use. (*Id.*) Because the customer provides and handles all receiving equipment (i.e., switching equipment, the transformers and substation), PECO charges HT customers lower rates than its typical General Service (GS) rate. (*Id.* ¶ 9.) PECO reviews the customer's receiving equipment to ensure it is safe for use on PECO's system, but the HT customer must also have a licensed underwriter certify its equipment before PECO will energize the service. (*Id.*)

In April 2003, PRPA and PECO entered into a three-year contract under which PECO would provide PRPA with its requested electric service at the HT rate. (*Id.* at Ex. 11.) The contract was drafted "in accordance with [PECO's] Tariff for Electric Service on file with the Public Utility Commission" and was governed by the rules, regulations, and base rates provided

---

[3] PRPA drew electricity to power the yard lights at its security house and gate. The Navy was not responsible for that consumption. (*Id.* at Ex. 4, PECO_PRPA_001_00000576.)

therein.  (*Id.*)  The Pennsylvania Public Utility Commission approves the Tariff each year.  (*Id.* at Ex. 10.)

### B.    Billing at the HT Rate

Billing under the HT Tariff requires more than simply multiplying the total kilowatt hours by one particular rate.  Rather, it is based on a number of components and adjustments. The first step in the billing process is determining two monthly measurements:  billed demand (kW) and consumption (kWh).  (*Id.* at Ex. 9 ¶ 12.)  Determining *consumption* is straightforward; it is based on readings from PECO's on-site meter.  Determining *billed demand*, however, is more complicated.  Demand is measured by the highest number of kilowatts the customer drew during the billing period, as measured by the PECO meter in thirty-minute intervals.  This is known as "measured demand."  (*Id.* ¶ 13.)  Measured demand is then adjusted under several circumstances to determine billed demand.

First, measured demand may be adjusted for power factor.  Under the HT Tariff, PRPA had to maintain a power factor of 90% or greater each month, otherwise the power factor adjustment could apply.[4]  (PECO Mot. for Summ. J. Ex. 9 at ¶ 14.)  Second, measured demand may be adjusted seasonally.  From October through May, the billed demand may not be less than 80% of the customer's highest billed demand in the preceding June through September;

---

[4]  In his Declaration, PECO's Senior Rates Engineer describes power factor as follows:

Power Factor is the fraction of AC current that is "in phase" with the AC voltage, and thus is available to deliver electrical energy (real power) to the load.  "Real Power" is that portion of Apparent Power that can "do work" or continuously deliver electrical energy to a load.  Power Factor = Real Power/Apparent Power. The power factor adjustment accounts for a customer's inefficient use of the high voltage electricity being supplied by PECO.

(PECO Mot. for Summ. J. Ex. 9 at ¶ 14 n.1.)

otherwise the seasonal demand adjustment, also known as "ratchet," could apply. (*Id.* ¶ 15; Ex. 14.) On top of these adjustments, billed demand is subject to a monthly minimum provided by the particular contract, which in this case was 1520 kilowatts (*id.* at Ex. 11), and a monthly minimum provided by the Tariff itself, which is 25 kilowatts. (*Id.* at Ex. 14.)

Once the monthly consumption and billed demand are determined, PECO calculates the monthly bill using separate generation, transmission, transition, and distribution charges. (*Id.* at Ex. 9 ¶ 20.) These charges are not flat rates. Instead, each category falls into one of three block rates and a demand charge, depending on the billed demand and consumption values. (*Id.* ¶¶ 21-29.) Next, there is a "Time-of-Use Adjustment" that applies if measured demand is over 2000 kilowatts in a billing period; for those customers, a credit is given for energy use during off-peak hours, and a charge is added for energy use during peak hours. (*Id.* ¶ 30.) Finally, the monthly bill reflects a standard flat fee, or "customer charge," and a state tax adjustment, which could either be a charge or a credit. (*Id.* ¶¶ 31-32.)

### C.     Navy Vessels in Port

After construction of the layberth was complete in November 2003, Navy representatives inspected the facility. They confirmed that it met contract specifications and declared it acceptable to host the Navy vessels. (*Id.* at Ex. 7.) The first vessels arrived at the layberth on November 12, 2003 and began consuming shore power. (*Id.* at Ex. 21.) PECO consequently began generating and submitting bills pursuant to the contract.[5] (PECO Mot. for Summ. J. at Ex. 20.) The vessels themselves were operated by private contractors. The first operator was Patriot

---

[5] PECO did generate bills for September and October 2003, and those bills were increased under the tariff minimum and the contract minimum, respectively. (PECO Mot. for Summ. J. at Ex. 20 (tabs 1-2)). However, the Navy was not invoiced for those months and paid no portion of those bills, since the ships were not yet in port. (*Id.* at Ex. 3.)

Contractor Services, LLC, and the second operator was AMSEA, which assumed operation of the vessels in March or April 2005.  (*Id.* at Ex. 41 ¶ 2; Ex. 39 ¶ 4.)

The bills for the first four months that the vessels were in port — November 2003 through February 2004 — reflected power factor adjustments.  (*Id.* at Ex. 20 (tabs 3-5).)   On February 23, 2004, PECO provided PRPA with a construction rider that waived the power factor adjustment, the contract minimum, and the tariff minimum for six months.  (*Id.* at Ex. 23; Ex. 20 (tabs 6-11).)  PECO later renewed that rider for another six months, which meant that the adjustment and minimums were waived from March 2004 to March 2005.  (*Id.* at Ex. 23; Ex. 20 (tabs 12-16); Ex. 1 at 313:13-16.)  PECO also lowered the contract minimum from 1520 kilowatts to 1120 kilowatts.  (*Id.* at Ex. 20 (tabs 7-35); Ex. 1 at 309:9-12.)

When the construction rider expired, the bills again reflected power factor adjustments.[6] (PECO Mot. for Summ. J. at Ex. 20 (tabs 18-23)).  In August 2005, at what appears to be PRPA's request, PECO's Account Manager conducted a rate analysis for the Navy layberth account.  (*Id.* at Ex. 24.)  She concluded that the HT rate was more favorable to the Navy than the GS rate by approximately $105,000 per year.  (*Id.*)

In late 2005, PRPA hired A-Valey Engineers, Inc. ("AVE"), a marine and nuclear engineering firm headed by Lothar Budike, to inspect and repair a malfunction in the boiler system at the terminal that was impeding the proper delivery of steam to the vessels.  (*Id.* at Ex. 27 at PECO_PRPA_001_00004258; *Id.* at Ex. 1 at 105:17-20.)  Upon his inspection of the terminal, Budike communicated concerns about PECO and recommended that AVE conduct a

---

[6]   The power factor adjustments continued through the next six months, until September 2005.  (PECO Mot. for Summ. J. at Ex. 20 (tabs 18-23).)  At that point, the power factor issues were apparently resolved, since the power factor adjustment was never assessed again.  (*Id.* at Ex. 20 (tabs 24-63).)

detailed Forensic Energy Assessment and Audit.[7]  (PECO Mot. for Summ. J. at Ex. 27,

PECO_PRPA_001_00004258.)  Budike expressed confidence that in conducting such an audit,

he could negotiate reimbursement from PECO for the portion of the payments that had been

triggered by the contract minimum, and/or that he could secure an overall reduction in rates

going forward.  (*Id.* at Ex. 3.)

     **D.**    **AVE's Comprehensive Energy Audit**

     In June 2006, PRPA hired AVE to conduct the audit and to negotiate with PECO on

PRPA's behalf "for a refund and/or rate reduction for the electric service at the Tioga Marine

Terminal LMSR Berth and the Authority's Port Administration Building."  (*Id.* at Ex. 26 at

Service Contract 1.)  Compensation to AVE was to be provided on a contingency basis:

> Payment is contingent upon [AVE] obtaining a rate reduction or reimbursement
> of costs from PECO.  In the event the Contractor successfully negotiates a return
> of monies to the Authority paid to PECO for charges occurring at the LMSR berth
> and the Authority's Port Administration Building, [AVE] shall receive 50% of the
> refund after any reimbursement of costs that the Military Sealift Command
> ("MSC") is entitled to under the Layberthing agreement between MSC and the
> Authority.  In the event [AVE] is successful in negotiating a rate reduction for
> future electrical use, [AVE] shall be entitled to receive as compensation, half the
> amount of savings resulting from the rate reduction for a period of thirty-six (36)
> months, payable within thirty (30) days of receipt of each monthly electric bill.

(*Id.*)

     In furtherance of the audit, PRPA gave AVE access to the PECO accounts connected to

the terminal.  (*Id.* at Ex. 27, PECO_PRPA_001_00004266.)  AVE subsequently requested that

PECO provide it with copies of "all implied and/or signed contracts between the PRPA and

PECO for the purchase and delivery charges of power for [the Navy vessels at] the Tioga Marine

---

[7]  He also proposed that PRPA hire AVE to construct a cogeneration plant, which would allow PRPA to generate its own power and rely on PECO as a back-up provider only.  (PECO Mot. for Summ. J. at Ex. 1, 113:20-114:2; Ex. 9 ¶ 39).  PRPA did not take this course.

Terminal Facilities," along with copies of all PECO bills from January 2003 through July 2006 for the PRPA/Navy accounts.  (*Id.* at Ex. 27., PECO_PRPA_001_00004269-70.)  The PECO Account Manager initially provided AVE with two years of usage history for the account; an unsigned, generic HT contract; and a copy of the HT Tariff explaining the rate.  (*Id.* at Ex. 27, PECO_PRPA_001_00004271-77.)  AVE later received detailed invoices for the full time period it requested and a copy of the signed contract.  (*Id.* at Ex. 1, 201:16-19 & 203:2-22.)

As part of the audit, Budike also installed his own meter at the layberth.  Budike's meter captured data for a seven-month period, from September 29, 2006 to April 30, 2007.  (*Id.* at Ex. 1 at 388:23-389:5.)  The meter measured raw consumption, but not peak demand or power factor.  (*Id.* at Ex. 1, 237:12-14 & 241:20-25; Ex. 28.)  Meanwhile, the meter gathering data for PECO at the layberth was experiencing malfunctions.  (Budike Opp'n to Mot. for Summ. J. Ex. A28, ECF No. 100; Budike Sur-Reply to PECO Exs. H-K, ECF No. 103; PECO Mot. for Summ. J. Exs. 35-36.)  PECO replaced it in March 2007, but the malfunctions nonetheless resulted in estimated billing for the months of March, April, and May 2007.  (PECO Mot. for Summ. J. Ex. 20 (tabs 41, 42, 44); Exs. 35-36.)

In September 2007, Budike submitted his audit report to PRPA.  The report expressed his conclusion that PECO had overcharged PRPA and the Navy in excess of $1.4 million.  (PECO Mot. for Summ. J. at Ex. 27, PECO_PRPA_001_00004262.)  To support that conclusion, he pointed to the PECO bills based on estimated, rather than actual, meter readings.  He also charged PECO with enforcing an unrealistic contractual minimum; with billing for more power than the vessels could consume; and with improperly approving a poorly designed substation and incorrectly installed circuit breakers.  (*Id.* at Ex. 27, PECO_PRPA_001_00004259-62.)

7

Even though the audit report includes a disclaimer that it was produced "without prejudice or bias to any party made a part hereof," at his deposition Budike stated that he embarked upon the audit with a long-standing view that PECO was a criminal organization and a principal defrauder of the United States. *See* PECO Mot. for Summ. J. at Ex. 1, 97:9-15 ("PECO was committing frauds . . . started in 1993.  I was after PECO.  Now you may know it.  I was after PECO, because PECO is part — Exelon is part of the people who are defrauding the United States of America.  I make that statement any time.").  Further, he accuses PECO of such acts as smuggling nuclear waste from Chernobyl to Philadelphia in a ship it stole from him (*id.* at Ex. 1, 100:3-101:17); employing Osama bin Laden (*id.* at 570:16-571:20); trying to blow up the United States (*id.* at Ex. 1, 78:7-10); and facilitating the U.S.S. Cole (*id.* at 560:10-561:20) and Boston Marathon bombings (*id.* at Ex. 1, 564:10-15), the Sandy Hook tragedy in Connecticut (*id.* at Ex. 1, 564:10-15), the September 11th terrorist attacks (*id.* at Ex. 1, 632:15-22), and the Deepwater Horizon oil spill (*id.* at Ex. 1, 558:5-9).[8]

---

[8]  These conspiracy theories are akin to those at the heart of another qui tam suit filed by Budike (represented by the same counsel) against Northrop Grumman in the Eastern District of Pennsylvania in 2009.  The Government also declined to intervene in that suit.  *See Budike v. Northrop Grumman Corp.*, No. 09-3799, slip op. (E.D. Pa. May 16, 2012). The case was dismissed in May 2012, because the court concluded that:

> Budike tellingly does not contest Northrop Grumman's assertion that he gives no factual basis for his belief that [Northrop Grumman] knowingly submitted falsified pricing data, nor can he.  His supposition is based on an implausible chain of inferences driven by a conspiracy theory.  There are no meetings, conversations, or emails indicating that anyone at [Northrop Grumman] intentionally submitted a false claim.

(*Id.*, slip op. at 10; PECO Mot. for Summ. J. at Ex. 44) (quotation marks omitted).

E.        Responses to the Audit Report

After PRPA received Budike's report, the Director of Finance at PRPA requested a meeting with the PECO Account Manager to discuss the alleged billing improprieties.  (PECO Mot. for Summ. J. at Ex. 33.)  The Account Manager agreed, and also conducted a current rate analysis confirming that the HT rate remained more economical than the GS rate by approximately $128,000.  (*Id.*)  The meeting between PECO and PRPA representatives occurred on September 28, 2007.[9]  (PECO Mot. for Summ. J. at Ex. 13, PECO_PRPA_001_00001402.)  PRPA asked for clarification on why some bills had been based on estimated, rather than actual, usage.[10]  PRPA also informed PECO that Budike's meter apparently reflected lower usage than PECO's meter did, and they relayed Budike's conclusion that the amount of power for which PECO was charging exceeded the maximum amount the vessels could use while docked at the terminal.  (PECO Mot. for Summ. J. at Ex. 13, PECO_PRPA_001_00001402.)  In response, PECO indicated they would conduct a meter investigation, in addition to the usage audit and rate analysis the Account Manager had recently done.  (*Id.*)  They also requested that PRPA solicit

---

[9]  Neither Budike nor any other AVE representative attended.  (PECO Mot. for Summ. J. at Ex. 5 ¶ 6; Ex. 13, PECO_PRPA_001_00001401.)

[10]  The bills were based on estimated usage in March, April, and May of 2007.  (PECO Mot. for Summ. J. Ex. 20 (tabs 42-44).)  PECO responded about a week after the meeting with the following written explanation:

> If there is just one missing ½ hour interval out of 1440 hours in a typical month, the usage on the PECO bill for that month is listed as estimated.  The missing interval is estimated by extrapolating from the intervals before and after the missing interval to fill the gap.  When there are large blocks of missing intervals, they are estimated based on either previous month's date or same month's date from the previous year, whichever usage is more in line with current usage.

(*Id.* at Ex. 37.)  The Account Manager indicated that a new meter had been installed in an effort to eliminate the need for estimated bills.  (*Id.*)  There were no estimated bills after the meter was replaced.  (PECO Mot. for Summ. J. at Ex. 20 (tabs 46-63).)

information from the Navy regarding the maximum electrical usage by the vessels docked at the

terminal, and about the vessels' power usage at other ports, for the sake of comparison.  (*Id.* at

Ex. 13, PECO_PRPA_001_00001402.)  Overall, PRPA was satisfied with PECO's response and

believed PECO was "willing to fully cooperate and resolve [the] situation."  (*Id.*)

PECO conducted its meter investigation and demonstrated that the meter was functioning

properly on October 3, 2007.  (*Id.* at Ex. 35, PECO-001-00000352.)  The Director of Finance at

PRPA spoke to Navy representatives, who confirmed that the daily power consumption rate

could in fact exceed the figure Budike had claimed was a ceiling.  (*Id.* at Ex. 5 ¶ 7.)  The Navy

also provided PRPA with data on the power consumption of all LMSR vessels for the first three

quarters of 2007.  (*Id.* at Ex. 38)  After considering that information, PRPA concluded that it had

not been defrauded or overbilled by PECO.  (*Id.* at Ex. 5 ¶ 8.)

The record indicates that the Navy was apprised of Budike's report and the ensuing

investigation into billing practices.  A document prepared by a Navy official includes a report

with a detailed analysis of PECO's invoices, meter readings provided by AMSEA, Budike's

findings and audit report spreadsheet, and power consumption information for the vessels while

they were berthed at other ports.  That report concluded that AVE's findings were not reliable

and that the Navy was not being overbilled.  (*Id.* at Ex. 39.)  Two emails generated by different

Navy representatives in late 2007 and early 2008 suggest that though PECO's charges were more

in line with AMSEA's readings than AVE's, they were still "on the high side" of reasonable, and

that it was therefore "worth a shot" to seek reimbursement for any discrepancy between PECO's

numbers and AMSEA's numbers.  (Budike Sur-Reply to PECO at Ex. F.,

PECO_FOIA_001_00000198, 00000194.)   The record does not indicate that the Navy pursued

this route, however.

The contract between PRPA and AVE ended in 2009.  (PECO Mot. for Summ. J. at Ex. 5 ¶ 9; Ex. 26.)

## II.    PROCEDURAL BACKGROUND

Budike chose to escalate his concerns beyond PRPA and the Navy.  He submitted a complaint to the United States Attorney's Office for the Eastern District of Pennsylvania alleging violations of the False Claims Act ("FCA"),[11] and specifically, improper billing practices by PECO with respect to the Navy vessels at the terminal.  (Am. Compl. ¶ 75, ECF No. 18.)  On October 3, 2007, he filed a sealed qui tam complaint in the Eastern District of Pennsylvania alleging claims pursuant to the FCA, under 31 U.S.C. §§ 3729(a)(1), (2), and (7).[12]   The Government spoke with Budike, considered the complaint, and investigated the charges.  Three

---

[11]   The FCA prohibits an entity from making false or fraudulent claims for payment to the United States.  31 U.S.C. § 3729(a).  Violators of the FCA are liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000, in addition to treble damages. *Id.*  The Act is enforced in two principal ways.  First, the Attorney General may, after a diligent investigation of a violation of § 3729, bring a civil action against that entity.  31 U.S.C. § 3730(a).  Second, a private person (called a "relator") may bring a qui tam action in the Government's name for such a violation.  31 U.S.C. § 3730(b).  In such a case, the relator must provide the United States with notice of the action, and the Government is entitled to intervene in the lawsuit.  *Id.*  The relator receives up to thirty percent of the proceeds of the action, as well as attorneys' fees and costs.  31 U.S.C. § 3730(d).  *See generally Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 411 (2005); *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 769-72 (2000).

[12]   The parties agree that the version of § 3729 that was in force before its amendment in May 2009 applies to Budike's FCA claims.  (*See* Am. Compl. ¶ 13; PECO Br. on Mot. to Dis. 18 n.5, ECF No. 43; AMSEA Br. on Mot. to Dis. 3 n.2, ECF No. 45.)  In that version, § 3729(a)(1) provides liability for any person or entity that knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval to an officer or employee of the United States Government.  Section 3729(a)(2) creates liability for those who knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.  And § 3729(a)(7) provides liability for those who knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.  All references throughout this Memorandum are to the 2008 version of § 3729.

years later, on November 1, 2010, it announced that it would not intervene.  (United States'
Notice of Election to Decline Intervention, ECF No. 14; PECO Mot. for Summ. J. at Ex. 1,
554:12-555:5.)

Budike requested a 180-day extension to serve the Defendants, so that he could "conduct
further investigative work" with respect to his claims. (ECF No. 16.)  The request was granted.
(Nov. 17, 2010 Order, ECF No. 17.)  On April 8, 2011, Budike filed an Amended Complaint.
(Am. Compl., ECF No. 18.)  The Amended Complaint named PRPA and AMSEA as additional
defendants, and included new claims for retaliation, discrimination, and retaliatory discharge.
(Am. Comp.)  PECO, PRPA, and AMSEA each moved to dismiss the Amended Complaint in
October 2011.  (ECF Nos. 43-45.)

In our September 2012 Memorandum, we dismissed with prejudice all claims against
PRPA on sovereign immunity grounds.  *United States ex rel. Budike v. PECO Energy*, 897 F.
Supp. 2d 300, 334 (E.D. Pa. 2012).  We also dismissed the retaliation, discrimination, and
retaliatory discharge claims against all Defendants, with prejudice, based upon Budike's lack of
standing.  *Id.* at 325-27.  The §§ 3729(a)(1) and (a)(2) claims against AMSEA were dismissed
*without* prejudice, as were the § 3729(a)(7) claims against both PECO and AMSEA.  *Id.* at 322-
23.  We determined that Budike had sufficiently stated claims under §§ 3729(a)(1) and (a)(2)
against PECO.  *Id.* at 317-321.

In November 2012, Budike filed a Second Amended Complaint, in which he added the
allegation that PECO and AMSEA had conspired to defraud the Navy in violation of
§ 3729(a)(3).[13]  (Second Am. Compl., ECF No. 60.)  PECO filed an answer on December 4,

---

[13]  Section 3729(a)(3) provides liability for any entity that "conspires to defraud the
Government by getting a false or fraudulent claim allowed or paid."  Budike raised his theory of

2012.  (ECF No. 64.)  AMSEA filed a motion to dismiss the Second Amended Complaint on

December 18, 2012.  (ECF No. 65.)  Budike opposed AMSEA's Motion to dismiss (ECF No.

67), but also requested leave to file another amended complaint.  (ECF No. 66.)  We denied

AMSEA's Motion to dismiss the Second Amended Complaint and granted Budike leave to file a

third amended complaint.  (ECF No. 76.)

　　　　Budike filed his Third Amended Complaint on November 4, 2013.  (Third Am. Compl.,

ECF No. 78.)  This complaint charges PECO with violations of §§ 3729(a)(1)-(a)(3) and (a)(7),

and charges AMSEA solely with violation of § 3729(a)(3).  (Third Am. Compl.; Mot. to Am.

Compl. 3, ECF No. 66.)

　　　　PECO and AMSEA filed their respective answers in November 2013 (ECF Nos. 79-80),

and discovery continued.[14]  Nearly a year later, on October 20, 2014, PECO moved for summary

judgment on all claims.  (PECO Mot. Summ. J.)  AMSEA joined that Motion.  (AMSEA Joinder,

ECF No. 96.)  PECO also requested that we suspend the final 45 days of discovery pending

resolution of its Motion for summary judgment, a request that Budike did not oppose.  (PECO

Mot. to Suspend Disc.)  On October 31, 2014, we granted the Motion to suspend discovery

pending resolution of the instant Motion.  (Order Suspending Discovery, ECF No. 97.)

　　　　On December 5, 2014, Budike filed Relators' Response to Defendants' Motion for

Summary Judgment.  (Opp'n to Mot. for Summ. J.)  PECO and AMSEA filed individual replies

---

conspiracy for the first time in his Response to the motions to dismiss.  We did not address the
issue in our September 2012 Memorandum and Order, since the allegation did not appear in the
Amended Complaint that was the subject of that motion.  *Budike*, 897 F. Supp. 2d at 322 n.25.

[14]  It appears that the parties began exchanging discovery as early as April 2013, before
Budike had filed his Third Amended Complaint.  (PECO Mot. to Suspend Disc. 3, ECF No. 93.)
While discovery was ongoing, in February 2014, Budike submitted a demand to PECO for $26.8
million.  (PECO Mot. for Summ. J. Ex. 40; Budike Opp'n to Mot. for Summ. J. 10.)

to Relators' Response on December 16 and December 23, respectively.  (PECO Reply, ECF No. 101; AMSEA Reply, ECF No. 102.)  In response, Budike filed a sur-reply to PECO on December 30, 2014, and to AMSEA on January 1, 2015.  (Budike Sur-Reply to PECO; Budike Sur-Reply to AMSEA, ECF No. 104.)  The Motion for Summary Judgment is now ripe for disposition.[15]

## III.   LEGAL STANDARDS

### A.      Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is "material" if it affects the outcome of the trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The party moving for summary judgment has the initial burden of proof, which is to demonstrate the absence of any genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Although the movant may choose to support its motion with affidavits, that approach is not required.  A motion for summary judgment "may, and should, be granted so long as whatever is before the district court demonstrates that the standard for summary judgment, set forth in Rule 56(c), is satisfied."  *Id.* at 323.  If the movant successfully demonstrates the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party, which must adduce "more than a mere scintilla of evidence" to support its assertion that a genuine dispute of material fact does exist.  *Williams v. Borough of West Chester*,

---

[15]  We have jurisdiction over this matter pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

891 F.2d 458, 460 (3d Cir. 1989).  If the nonmovant fails to make a showing sufficient to

"establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial," summary judgment is required.  *Celotex*, 477 U.S. at 322.

### B.    False Claims Act

To establish a claim under the FCA, a Relator must prove that "(1) the defendant

presented or caused to be presented to an agent of the United States a claim for payment; (2) the

claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."

*United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 304-05 (3d Cir. 2011);

*see also* §§ 3729 (a)(1)-(2).  In the context of the FCA, "knowing" means that the defendant (1)

had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity

of the information; or (3) acted in reckless disregard of the truth or falsity of the information.

§ 3729(b).  No proof of specific intent to defraud is required.  *Id.*

## IV.    DISCUSSION

The FCA prohibits the presentation of false claims to the government that the presenter

*knows* to be false or fraudulent.  31 U.S.C. §§ 3729(a)(1)-(2).  Scienter is therefore an essential

element of an FCA claim.  *See, e.g.*, *United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*,

495 F.3d 103, 109-10 (3d Cir. 2007).  If PECO demonstrates that it did not knowingly submit

false bills to the Navy, Budike's claims can survive summary judgment only if he counters that

demonstration with sufficient proof of scienter, such that a reasonable jury could find in his

favor.  *See Celotex*, 477 U.S. at 323-24; *Hefner*, 495 F.3d at 108-09.  We therefore address this

threshold question at the outset:  does this record demonstrate that PECO submitted a false claim

to the Navy *knowing* that it was false?

15

### A.  Claims Against PECO Under §§ 3729(a)(1), (2), and (7)

Budike's claims against PECO arise primarily under §§ 3729(a)(1), (2), and (7).  Section 3729(a)(1) provides liability for any person who knowingly presents, or causes to be presented, a false or fraudulent claim to the United States for payment or approval.  Subsection (a)(2) provides liability for any person who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.  And Subsection (a)(7) provides liability for any person who knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay the Government.

PECO argues that Budike has not demonstrated that it knowingly submitted any false bill for power supplied to the Navy vessels.  In support of that proposition, PECO submitted substantial documentation with its Motion, including email correspondence between PRPA, PECO, and Budike/AVE; internal PECO correspondence and memoranda regarding the Navy account; copies of the PRPA-Navy and PRPA-PECO contracts; PECO's meter records; bills spanning the length of the account, 2003-2008; the declarations of the PRPA Director of Finance, who oversaw the Navy account, and of a PECO Senior Rates Engineer, to explain the technical process of billing under the HT Tariff; deposition testimony from Budike; and internal Navy emails and memoranda concerning the layberth account that were secured through PECO's request under the Freedom of Information Act.

PECO's exhibits indicate that its billing was done in accordance with the contract, which was based on the HT Tariff.  (PECO Mot. for Summ. J. Exs. 9-10.)  The documents further indicate that the HT Rate was in fact the most cost-effective rate.  PECO conducted rate analyses several times throughout the life of the contract to ensure that remained the case.  (PECO Mot.

for Summ. J. Exs. 13, 24-25, 33; Budike Sur-Reply to PECO Ex. C at PECO-001-00000385-87.)
It is also clear that provisions of the contract were revisited and adjusted periodically after
negotiation between the parties.  (*See*, *e.g.*, PECO Mot. for Summ. J. Ex. 23; PECO Mot. for
Summ. J. Ex. 1 at 309; Budike Opp'n Ex. A22, Lawrence-Kelly email and Brown-Budike email;
Budike Opp'n Ex. A27, Billing Screen Customer Comments; Budike Sur-Reply to PECO Exs.
B-C; PECO Mot. for Summ. J. Ex. 16.)

The evidence also demonstrates that neither PRPA nor the Navy was shy about raising
concerns about billing to PECO, and that when any concern was expressed, PECO investigated
the issue, then shared its results with PRPA and took action accordingly.  (*See*, *e.g.*, Budike
Opp'n Ex. A27 at Billing Screen Customer Comments; *Id.* at A28; Budike Sur-Reply to PECO
Exs. B-C, N-O; PECO Mot. for Summ. J. Exs. 5, 13.)  Documents suggest that the Navy and
PRPA were satisfied with PECO's responses.  (PECO Mot. for Summ. J. Exs. 5, 39.)  After
careful review of this evidence, we are satisfied that PECO has made a colorable showing that it
did not knowingly defraud the Navy.  The burden therefore shifts to Budike to demonstrate that
PECO knowingly presented the Navy with false bills.  Budike has advanced a number of theories
on this issue in his briefing (though in his deposition, he identified only one).  We address each
in turn.

     *1.  The Bills*

At his deposition, Budike cited the bills as his only evidence of scienter.  He suggested
that PECO's bills for the power supplied to the vessels were overly high for so long that their
alleged inaccuracy could not have been a mistake, and that PECO must have known its bills were
fraudulent.  (*Id.* at Ex. 1 at 513-16).  This argument is unpersuasive on this record, since there is
nothing to indicate that PECO knew what a "normal" bill for two LMSR vessels was.  In fact, the

record suggests just the opposite.  It demonstrates that when representatives from PECO and PRPA met to discuss Budike's audit report in September 2007, PECO asked PRPA to solicit information from the Navy about the vessels' power usage at other ports, to find out what an average bill for the vessels would be.  (PECO Mot. for Summ. J. Ex. 13 at PECO_PRPA_001_00001402.)

Indeed, the only entity that could conclusively know what an average bill for these vessels looked like — the Navy — did not consider PECO's billing so overly-high that it was necessarily fraudulent.  In one document, a Navy representative indicated that any data he could assemble showing a discrepancy between the usage reflected in PECO's billing and the average usage data provided by AMSEA would be "circumstantial," but that it might still be "worth a shot" to ask PECO for a billing adjustment.[16]  (Budike Sur-Reply to PECO Ex. F at 2/15/08 email.)  Another Navy document indicated that PECO's charges were "on the high side" of reasonable.  (*Id.* at Ex. F at 11/27/07 email.)  And yet another stated that after a very detailed analysis, PECO's charges were in line with expectations.  (PECO Mot. for Summ. J. Ex. 39 at PECO_FOIA_001_00000231[17]; *see also* PECO Mot. for Summ. J. Ex. 5 ¶ 8.)  There is no

---

[16]  We note that, according to the Navy's analysis, the difference between PECO's numbers and AMSEA's numbers was less than 1%.  (PECO Mot. for Summ. J. Ex. 39 at PECO_FOIA_001_00000229.)

[17]  This document is an internal Navy email that PECO acquired through its FOIA request.  (PECO Mot. for Summ. J. Ex. 43.)  Budike attacks its authenticity in his Opposition, and dismisses it as a relatively early document. (Budike Opp'n at 27).  While part of the document is dated April 2007, we note that other parts rely on data from as late as September 2007.  (PECO Mot. for Summ. J. Ex. 39 at PECO_FOIA_001_00000232.)  Moreover, Budike himself cites other Navy documents that were produced to him, originating from that same FOIA request, in support of his position.  (Budike Sur-Reply to PECO at 8 n.1 & Ex. F.)  He has therefore waived his authenticity argument.  *See United States v. Isley*, 386 F. App'x 117, 120 (3d Cir. 2010) (defendants contesting the authenticity of answers to interrogatories, who themselves also submitted the answers as an attachment to a declaration made in support of their

indication that PECO submitted bills so obviously high[18] that they were necessarily fraudulent. Budike has not demonstrated scienter on this theory.[19]

### 2. *PECO's Meter*

Budike next contends that PECO's meter malfunctions, which caused several bills to be calculated with estimated rather than actual usage data, demonstrate that PECO knowingly submitted false bills to be paid by the Navy.[20]  The documents do reflect that PECO's meter experienced malfunctions for several months.  (Budike Opp'n to Mot. for Summ. J. Ex. A28; Budike Sur-Reply to PECO Exs. H-K; PECO Mot. for Summ. J. Exs. 35-36).  But the documents also indicate that PECO worked to remedy the malfunctions, and when it could not, it replaced

---

own motion for summary judgment, had "invited any error the District Court may have made in relying on them as authentic").

[18]  Implicit in Budike's position is his belief that PECO's usage numbers were inflated, because his meter apparently reflected lower consumption than PECO's did over the course of seven months.  We note that Budike testified at his deposition that his meter did not measure actual ship consumption (PECO Mot. for Summ. J. Ex. 1 at 260:24-261:2), and that he further posited that power was being stolen from the ships by an unknown entity (*id.* at 256:11-22; 254:2-10).  We also note that the meter Budike set at the layberth to capture data coming from the ships did not measure power factor or peak demand (*id.* Ex. 1 at 239-42; Ex. 28), which are key components in billing under the HT Tariff.  Finally, we note that it appears that in concluding the bills were obviously too high, Budike may not have accounted for ratchet, even though ratchet impacted the bills heavily over the life of the account.  Of the forty-seven bills generated between 2005 and 2007, twenty of them reflected ratchet increases.  (*Id.* Ex. 20 (tabs 15-63).)

[19]  The record demonstrates that PECO changed the format of its bills in October 2006.  (PECO Mot. for Summ. J. Ex. 20 (tabs 35-36).)  Budike points to this change as evidence of knowing fraud by PECO.  (Budike Sur-Reply to PECO 9.)  PECO asserts that the change in bill format was simply the result of a new computer system.  (PECO Mot. for Summ. J. Ex. 9 ¶ 36.)  We see no reason why a different layout of the bill would indicate knowing fraud on PECO's part.

[20]  It is undisputed that calculating bills with estimated, rather than actual, data is expressly permitted by the HT Tariff.  (Budike Sur-Reply to PECO Ex. L; PECO Mot. for Summ. J. Ex. 1 at 336-37.)

the meter entirely.  (PECO Mot. for Summ. J. Exs. 35-36; Budike Opp'n to Mot. for Summ. J. Ex. A28; Budike Sur-Reply to PECO Exs. H-K.)  Contrary to Budike's characterization, the bare fact that PECO's meter malfunctioned periodically over the course of three months is not itself proof that PECO committed knowing fraud.  Mistakes, problems, and negligence do not establish scienter in the context of the FCA.  *Hefner*, 495 F.3d at 110 ("The mere failure of a system to catch an error does not establish recklessness" under the FCA.); *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464-65 (9th Cir. 1999) (negligence is not a basis for an FCA claim); *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992 ("Proof of one's mistakes or inabilities is not evidence that one is a cheat."), *overruled on other grounds*, *United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, ---F.3d---, 2015 WL 4080739 (9th Cir. 2015).

In establishing scienter under the FCA, the relevant question is whether PECO addressed those meter malfunctions and attempted to resolve them, or whether PECO instead willfully or recklessly ignored the malfunctions.  Evidence of the latter — of the proverbial ostrich with its head in the sand — would qualify as "knowing" behavior under the FCA.  *See United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 768-69 (8th Cir. 2002); *cf. United States ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall*, 355 F.3d 1140, 1150-51 (9th Cir. 2004).  However, the record here is clear that PECO did repeatedly address the malfunctions and attempt to remedy them.  (Budike Opp'n Ex. A28; Budike Sur-Reply to PECO Exs. H-K & O; PECO Mot. for Summ. J. Exs. 35-36).

Similarly, Budike contends that PECO's meter continued to malfunction even after it was replaced, and he argues that this is evidence of knowing fraud on PECO's part.  (Budike Sur-Reply to PECO 10-11.)  Budike states that PECO's activity log for the Navy account reflects 32 entries of "Billing Issues" *after* the malfunctioning meter had supposedly been replaced.  (*Id.*)  It

is not clear that an entry reflecting "billing issues" necessarily means the meter is malfunctioning.  But assuming that it does, PECO's ineptitude in successfully repairing the meter does not, alone, trigger FCA liability.[21]  *See Wang*, 975 F.2d at 1421 ("[W]hile FMC might have been groping for solutions, it was not cheating the government in the effort."); *Oliver*, 195 F.3d at 464-65 (negligence is not a basis for an FCA claim); *see also Hefner*, 495 F.3d at 110 ("The mere failure of a system to catch an error does not establish recklessness" in the context of the FCA.).  Budike has not demonstrated scienter on this theory.

### 3.   The Electrical Design

Budike argues that PECO participated in the design of the electrical supply system that was built to service the Navy vessels, and that its participation in that process establishes its knowledge of inaccurate billing.  (Budike Sur-Reply to PECO 3-5.)  This argument fails.

The documents demonstrate that PRPA hired a private consultant, William Brown, to design and construct the electrical supply system to service the layberth at issue.  (PECO Mot. for Summ. J. at Ex. 5-6; Budike Sur-Reply to PECO at Ex. D.)  PECO did not participate in the design or construction of the set-up.  However, PECO engineers did insist that they approve the safety of the set-up before they would energize the service.  (Budike Opp'n Ex. A22, Hornberger Letters, HT Customer Equipment Checklist, PECO Outline for Customer's Electric Service; Budike Opp'n Ex. A23, Hornberger Letters, Checklist.)  There is no indication in the record that requiring such approval was unusual or nefarious, or done for any reason other than to guarantee a safe infrastructure to deliver PECO's product.

---

[21]   Furthermore, if PECO were knowingly defrauding the Navy, it is unclear why it would indicate that there were "Billing Issues" in the account's activity log, rather than simply passing off the billing as usual and unproblematic.

In a similar vein, Budike complains that the electrical system was incapable of adequately differentiating between the Navy's and PRPA's electrical consumption.  (Budike Sur-Reply to PECO 5-6.)  But the documents indicate that PECO's sole concern in the design and construction of the set-up was ensuring its safety.  (Budike Opp'n Ex. A22, Hornberger Letters, HT Customer Equipment Checklist, PECO Outline for Customer's Electric Service; Budike Opp'n Ex. A23, Hornberger Letters, Checklist.)  Moreover, PECO was not a party to the contract between PRPA and the Navy, and had no involvement with how the bill was divided between them.  (PECO Mot. for Summ. J. Ex. 5.)  Budike has not proven scienter on this theory.

#### 4. *The Contract Minimum and the Power Factor Requirement*

Budike asserts that PECO knowingly set an improperly low usage minimum and an improperly high power factor requirement in its contract with PRPA, and that this constitutes scienter on PECO's part.  He contends that "proper maximum and minimum values and a proper Power Factor would have resulted in lower charges to the Navy."  (Budike Sur-Reply to PECO 7.).  In his opposition to this Motion, he declares that PECO has conceded both that the contract minimum was inflated and that its calculations based on the original power factor were overstated.  (Budike Opp'n to Mot. for Summ. J. 10; PECO Mot. for Summ. J. Ex.1 at 171-73.) PECO has submitted evidence that it never made such concessions (PECO Mot. for Summ. J. Ex. 5), and the documents Budike cites in this regard do not substantiate his contention.[22]

_____

[22] Budike points to an email from the PECO account manager to a member of the billing department, in which she requested that the billing department verify that the factors set for the account were correct, as PRPA had hired a consultant (Budike) "who says [PECO] is overbilling."  (Budike Sur-Reply to PECO, Ex. N.)  Budike also points to an email from the account manager requesting assistance from another PECO employee in investigating AVE's allegations.  (Budike Sur-Reply to PECO, Ex. O.)  These documents do not support Budike's assertion that PECO conceded they had overcharged the Navy.

Absent evidentiary support, this assertion must be rejected at the summary judgment stage.  *See, e.g.*, *Wang*, 975 F.2d at 1420 (granting summary judgment to defendant in FCA case where plaintiff had "no evidence" that defendant had committed anything more than negligence, when virtually all plaintiff's evidence consisted of his own affidavit).

Moreover, while it is undoubtedly true that a lower power factor requirement would have resulted in lower charges to the Navy,[23] there is no evidence to support Budike's assertion that the contract minimum[24] and the power factor requirement here were "improper."  What the evidence does demonstrate is that these were contractual terms that were negotiated, and periodically adjusted, by the parties as circumstances changed during the life of the contract.  (*See, e.g.*, PECO Mot. for Summ. J. Ex. 23, Ex. 16, Ex. 1 at 309, lines 9-12; Budike Opp'n Ex. A22, Lawrence-Kelly email and Brown-Budike email; Budike Opp'n Ex. A27, Billing Screen Customer Comments; Budike Sur-Reply to PECO Exs. B-C.)  Despite Budike's characterization to the contrary, the adjustment of a contractual term to better accommodate a customer is no proof that the original term was fraudulent.

Budike has not demonstrated scienter on this theory.

     *5.  Miscellaneous Issues*

---

[23]  Throughout the life of the contract, the bills were increased ten times on account of the power factor requirement. (PECO Mot. for Summ. J. Ex.20 (tabs 3-5, 18-23).)

[24]  It is not true that a lower contract minimum would have resulted in lower charges to the Navy.  Only one bill was increased on account of the contract minimum (PECO Mot. for Summ. J. at Ex. 20 (tab 2)), and the Navy was not responsible for it because the vessels were not yet in port.  (*Id.* at Ex. 3.)  Furthermore, the contract minimum was lowered upon PRPA's request in May 2004, and no bill was increased on account of that provision thereafter.  (*Id.* at Ex. 20 (tabs 7-35); Ex. 1 at 309:9-12.)

We briefly address two of Budike's other allegations on scienter, which prevented dismissal of his claims under Federal Rule of Civil Procedure 12(b)(6) and which have not been borne out on this record.  Budike alleged that PECO knowingly drafted an illusory contract to provide power to the Vessels, then to conceal its overbilling, drafted a second illusory contract that reduced the minimum demand to a still-unrealistic level once the Vessels arrived in port. (Am. Compl. ¶¶ 45-46; Third Am. Compl. ¶¶ 43-44; Sept. 13, 2012 Mem. on Mot. to Dismiss 25-26.)  The record includes a copy of the PECO-PRPA contract, which is not illusory.  (PECO Mot. for Summ. J. Ex. 11.)  The contract was indeed adjusted, once to reduce the contract minimum, and at another point, to create a grace period so that PRPA could tweak its new electrical system and increase its efficiency, which would help it to meet the power factor requirement.  (Budike Ex. A22 (6/14/07 Budike-Brown email & 10/23/03 Lawrence-Kelly email).)  The record reveals that these adjustments were not made in an effort to conceal overbilling.

Likewise, Budike alleged in his complaint that a PECO employee refused to provide him with a copy of the signed PECO-PRPA contract and detailed invoices for the PRPA account, which Budike requested while he was producing his audit report.  He claimed that this proved that PECO was knowingly defrauding the Navy.  (Am. Compl. ¶¶ 30-37; Third Am. Compl. ¶¶ 30-35; Sept. 13, 2012 Mem. on Mot. to Dismiss 26.)  The record does demonstrate that the account manager initially provided Budike with two years of usage history for the account; an unsigned, generic HT contract; and a copy of the HT Tariff explaining the rate.  However, it also makes clear that Budike later received the copy of the signed contract and the detailed invoices for the full time period that he requested.  (PECO Mot. for Summ. J. Ex. 1 at 201:16-19; 203:2-22.)

24

6.   *No Evidence of Scienter*

After a careful examination of all of the documents submitted by both parties, it is apparent that there is nothing in the record, either individually or cumulatively, to support the notion that PECO knowingly defrauded the Navy, as that term is defined by the FCA.  Since Budike has failed to make a showing sufficient to establish the existence of scienter, an element essential to his case, and on which he has the burden of proof at trial, entry of summary judgment in favor of PECO on the claims pursuant to §§ 3729(a)(1), (2), and (7) is required.  *Celotex*, 477 U.S. at 322.

**B.   Claims Against PECO and AMSEA Under § 3729(a)(3)**

Budike claims that PECO and AMSEA conspired to knowingly defraud the Navy with respect to the bills for power provided to the Vessels at the Tioga Terminal, in violation of § 3729(a)(3).  31 U.S.C. § 3729(a)(3) (providing liability for any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid").  At the outset, we observe that Budike appears to have abandoned this argument at his deposition.  The following exchange occurred at the deposition:

Q:  Was there a conspiracy between AMSEA and PECO with regard to the electricity charges that you're challenging in this case?

A:  No.

(PECO Mot. for Summ. J. Ex. 1 at 704:22-25.)

In his Sur-Reply to AMSEA's brief in favor of this Motion, Budike maintains that he has not in fact waived his conspiracy claim.  He contends that it would be "absurd" and "far from accurate" to interpret his apparent abandonment at the deposition as intentional waiver, and he

blames fatigue and language barrier for his response.[25]   (Budike Sur-Reply to AMSEA 10.)

Even read in context and construed liberally in his favor,[26] it is difficult to view Budike's

response as anything other than intentional abandonment.  In any event, the conspiracy claim

fails by reason of our conclusion that summary judgment is warranted on the §§ 3729(a)(1), (2),

and (7) claims against PECO.  Since Budike has failed to make a showing sufficient to establish

that PECO knowingly defrauded the Navy in any fashion — *see* Part IV.A., *supra* and *Celotex*,

477 U.S. at 322 — AMSEA could not have conspired with it in defrauding the Navy.[27]  *See*

---

[25]  Budike's mother tongue is Dutch.  (Budike Sur-Reply to AMSEA, Ex. O at 12.)

[26]  The text leading to Budike's response is as follows:

Q:  I'm focused on an agreement between AMSEA and PECO with regard to the electricity charges that you're contending were a fraud?

A:  No.  No agreement, no.  No, no.  I don't know of any agreement.

Q:  Okay.  Now, sometimes in the law we use fancy words.  So instead of the word "agreement," we can call it a conspiracy.  It's the same, it's an agreement, but we call it a conspiracy.  Okay?

A:  Right.  You mean a con game, whatever.

Q:  Whatever.  So let's use the word "conspiracy" rather than agreement.

A:  Okay.

Q:  Was there a conspiracy between AMSEA and PECO with regard to the electricity charges that you're challenging in this case?

A:  No.

(PECO Mot. for Summ. J. Ex. 1 at 704:5-25.)

[27]  We also note that Budike relies heavily on his own testimony as proof of a conspiracy between PECO and AMSEA.  (Budike Sur-Reply to AMSEA 10.)  This is insufficient at the summary judgment stage.  *See Wang*, 975 F.2d at 1420.

*United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 255 F. Supp. 2d 351, 409 (E.D. Pa. 2002) (to state a claim for conspiracy under the FCA, a plaintiff must show "that the defendant *conspired with one or more persons* to get a false or fraudulent claim allowed or paid by the United States") (emphasis added); *see also United States ex rel. Petras v. Simparel, Inc.*, No. 13-2415, 2015 WL 337472, at *8 (D.N.J. Jan. 26, 2015).

### C.  Discovery Issues and Budike's Request for Sanctions

In his opposition to this Motion, Budike rather baldly claims that "Defendants have spoliated evidence and/or failed to produce evidence" to his detriment, and he asks us to sanction PECO and AMSEA.[28]  (Budike Opp'n 10, 26-27.)  In his Sur-Reply to AMSEA's brief, Budike elaborates on this argument, the crux of which appears to be his desire that AMSEA produce its ship logs to him and provide him access to former AMSEA Chief Engineer John Duke.  (Budike Sur-Reply to AMSEA 12-13.)

---

[28]  Budike also requests relief under Federal Rule of Civil Procedure 56(e).  (Budike Opp'n 10, 26-17; Budike Sur-Reply to AMSEA 12-13.)  Rule 56(e) provides that:

> *If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)*, the court may:  (1) given an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or (4) issue any other appropriate order.

(Emphasis added.)

It is not clear what relevance Rule 56(e) has to Budike's assertion that Defendants have failed to produce evidence.  *Cf. J & J Sports Prods., Inc.*, No. 13-5358, 2015 WL 1256040, at *4 n.1 (E.D. Pa. Mar. 18, 2015) (considering whether one party failed to address a crucial fact asserted by the other, as contemplated by Rule 56(e)); *Stanford v. Nat'l Grange Ins. Co.*, 64 F. Supp. 3d 649, 651 n.2 (E.D. Pa. 2014) (same); *Lazarde v. City of Reading*, No. 10-5139, 2012 WL 4473246, at *1 (E.D. Pa. Sept. 28, 2012) (same).  Accordingly, we deny this request.

The parties engaged in discovery for sixteen months.  (PECO Mem. in Support of Mot. to Suspend Discovery 1.)  The substantial record before us demonstrates that this discovery exchange was fruitful.  When PECO and AMSEA moved to suspend discovery upon the filing of this Motion,[29] Budike did not oppose suspending discovery.  He did so undoubtedly knowing that he would file a brief opposing summary judgment, and that he would consequently be required to provide evidence of a genuine dispute of material fact.  His claim that additional discovery is now required rings hollow.[30]

## V.    CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment advanced by Defendants PECO and AMSEA will be granted.  Budike's requests for sanctions and for relief under Rule 56(e) are denied.

An appropriate Order follows.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK, J.**

---

[29]  Only 45 days remained in the discovery period when discovery was suspended. (PECO Mot. to Suspend Disc. 1-2.)

[30]  This is especially true because, in response to PECO's request for documents, Budike indicated that he no longer had access to "any A-Valey or personal computer(s) that might contain relevant documents or data," and that "he no longer ha[d] access to relevant email accounts."  (PECO Mot. for Summ. J. Ex. 31.)